KELLY, J.
This case involves whether, and the extent to which, plaintiffs’ claims asserted under the Michigan Whistleblowers’ Protection Act (WPA)[1] are preempted by the National Labor Relations Act (NLRA)[2] and the Labor-Management Reporting and Disclosure Act (LMRDA).[3] Plaintiffs allege that defendants violated the WPA when they discharged plaintiffs in retaliation for reporting to the United States Department of Labor their suspicions of fraud, embezzlement, improper wages, and unsafe working conditions or for participating in the Department of Labor’s ensuing investigation. *268 Defendants argue that the NLRA and LMRDA preempt plaintiffs’ WPA claims and, as a result, the state court must dismiss those claims.
Congress enacted the NLRA and the LMRDA to protect the rights of employees and union members from infringement by employers and unions. The NLRA established the National Labor Relations Board (NLRB), which has exclusive jurisdiction over activity “arguably subject” to §§ 7[4] and 8[5] of the NLRA.[6] These provisions forbid an employer from interfering with an employee’s right to engage in concerted activities for the mutual aid or protection of employees.[7] The LMRDA safeguards a union member’s ability to elect union leadership, provides broad discretion for elected union officials to implement their policies, and protects union members who exercise their freedom of expression from retaliation by union officials.[8] More recently, the Michigan Legislature enacted the WPA to protect employees from retaliation for reporting violations or suspected violations of laws and regulations to a public body.[9]
We hold that neither the NLRA nor the LMRDA preempts WPA claims premised on reporting suspected criminal misconduct. The NLRA does not cover the reporting of suspected criminal misconduct, while the LMRDA does not provide a union official with discretion to cover up suspected criminal misconduct by retaliating against employees who report their allegations. However, plaintiffs’ allegations of retaliation for *269 their reporting of improper wages and an unsafe work environment cover conduct “arguably prohibited” by the NLRA and, as a result, must be litigated exclusively before the NLRB. Accordingly, we affirm in part the decision of the Court of Appeals and remand this case to the Wayne Circuit Court for further proceedings consistent with our opinion.
I. FACTS AND PROCEDURAL HISTORY
Defendant Laborers’ Local 1191 is a Wayne County labor union that represents construction workers. At all times relevant to these consolidated appeals, the union’s member-elected leadership included its president (defendant Bruce Ruedisueli) and its business manager (defendant Michael Aaron). The union also employed several unelected business agents who serve at the pleasure of the business manager. Plaintiffs Anthony Henry and Keith White (Docket No. 145631) and Michael Ramsey and Glenn Dowdy (Docket No. 145632) all worked as business agents until their terminations.
While the facts leading up to plaintiffs’ terminations are contested, it is undisputed that in September 2009, defendants asked several Local 1191 members to repair the crumbling fagade of the Trade Union Leadership Council (TULC) building.[10] The work lasted for two days, and each member received $30 a day. Although Local 1191 recorded these payments as “picket duty” on the memo line of the checks used for payment and in the union’s treasury, it admits that its members did not engage in picket duty on those days.
*270 Henry witnessed the work. He and the three other plaintiffs suspected that Aaron was involved in criminal activity, including fraud, an illegal kickback scheme, and misappropriation of union funds. They also believed that Local 1191 required members to work without proper safety precautions and without receiving union wages. As a result, on September 25, 2009, Henry circulated an unsigned open letter to Local 1191’s leadership and distributed that letter to union membership, the union’s parent leadership, and local news outlets. In the letter, Henry asked why Local 1191 was paying members out of its picket fund to work on a for-profit establishment (the TULC) and suggested that Aaron had received illegal kickbacks from the TULC in exchange for providing the TULC with free construction labor. The letter also complained that union members received only $60 for two full days of work.
In October 2009, Henry and White contacted the United States Department of Labor with their suspicions and informed the union of their decision to report the allegations.[11] The Department of Labor investigated the allegations and interviewed several union employees and officials.[12] It subsequently referred the matter to an Assistant United States Attorney, who declined to intervene.[13]
*271 On November 11, 2009, Aaron notified Henry and White that they were indefinitely laid off from employment at Local 1191. The letters claimed that the “extremely difficult economic climate” necessitated the layoffs. Henry and White disputed that stated rationale and, instead, filed a complaint in the Wayne Circuit Court against Local 1191 as an entity and against Aaron and Ruedisueli individually, in which they alleged unlawful retaliation under the WPA.
During the pendency of that initial action, Dowdy and Ramsey were terminated from their employment at Local 1191. Dowdy and Ramsey claim that they were terminated for their cooperation in the Department of Labor investigation and for disclosing to investigators facts substantiating the allegations of criminal illegality.[14] They also filed a separate WPA complaint against Local 1191 as an entity and against Aaron and Ruedisueli individually.
Defendants moved for summary disposition in the Henry/White lawsuit and for partial summary disposition in the Dowdy/Ramsey lawsuit,[15] alleging that the LMRDA preempted plaintiffs’ WPA claims and that, as a result, the circuit court lacked subject-matter jurisdiction to hear them.[16] The court denied the motions from the bench, concluding that the WPA’s protection of an employee against an employer’s retaliatory employment actions does not contravene the LMRDA because the LMRDA only protects from retaliation the rights afforded union members.
*272 On appeal, defendants reasserted their claim of LMRDA preemption and raised the new defense that the NLRA independently preempted the circuit court from exercising subject-matter jurisdiction. The Court of Appeals affirmed the circuit court’s ruling in an unpublished opinion.[17] The Court agreed with the circuit court that plaintiffs “have not alleged any infringement on their membership rights” and that, as a result, the LMRDA’s protections did not cover plaintiffs’ claims.[18] The Court also examined whether the WPA undermined the LMRDA’s democratic purpose to give elected union officials the discretion to implement policies that reflect the wishes of union membership. The Court concluded that plaintiffs’ claims did not infringe union leaders’ discretion “where a union employee claims wrongful discharge for refusing ‘to commit or aid in committing a crime’... .”[19] Finally, the Court held that the NLRA did not preempt plaintiffs’ claims because “[a] claim for retaliatory discharge arising out of an employee’s report of suspected illegal activity or participation in investigation thereof is only of peripheral concern to the NLRA’s purpose of protecting employees’ rights to engage in ‘concerted activities for the purpose of collective bargaining or other mutual aid or protection.’ ”[20]
This Court granted defendants’ applications for leave to appeal and requested that the parties brief
(1) whether, regardless of the public body involved, the National Labor Relations Act (NLRA), 29 USC 151 et *273 seq., or the Labor Management Reporting and Disclosure Act (LMRDA), 29 USC 401 et seq., preempt Michigan’s Whistle-blowers’ Protection Act (WPA), MCL 15.361 et seq., if the challenged conduct actually or arguably falls within the jurisdiction of the NLRA or the LMRDA; (2) whether a union employee’s report to a public body of suspected illegal activity or participation in an investigation thereof is of only peripheral concern to the NLRA or the LMRDA so that the employee’s claims under the WPA are not preempted by federal law; and, (3) whether the state’s interest in enforcing the WPA is so deeply rooted that, in the absence of compelling congressional direction, courts cannot infer that Congress has deprived the state of the power to act.[21]
II. STANDARD OF REVIEW
Defendants assert that federal law preempts plaintiffs’ WPA claims and precludes Michigan courts from exercising subject-matter jurisdiction over them. As a result, they argue, they are entitled to summary disposition pursuant to MCR 2.116(C)(4).
Jurisdictional questions under MCR 2.116(C)(4), including whether federal statutory law preempts state law,[22] are questions of law that we review de novo.[23] In deciding whether to grant a motion for summary disposition pursuant to MCR 2.116(C)(4), a court must consider “[t]he affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties . . . .”[24]
*274 hi. ANALYSIS
A. GENERAL PREEMPTION PRINCIPLES
In M‘Culloch v Maryland, Chief Justice John Marshall addressed the relationship between the federal and state governments in our constitutional republic:
If any one proposition could command the universal assent of mankind, we might expect it would be this — that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result, necessarily, from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one state may be willing to control its operations, no state is willing to allow others to control them. The nation, on those subjects on which it can act, must necessarily bind its component parts. But this question is not left to mere reason: the people have, in express terms, decided it. .. .[25]
To this end, the Framers of the Constitution drafted, and the people ratified, the Supremacy Clause, which states the core principle of preemption:
This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.[26]
Justice Cooley observed that the Supremacy Clause requires “[a] State law [to] yield to the supreme law, whether expressed in the Constitution of the United States or in any of its laws or treaties, so far as they *275 come in collision. . . .”[27] However, because a state’s traditional police powers are broad, the United States Supreme Court has explained that “ [consideration of issues arising under the Supremacy Clause start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the clear and manifest purpose of Congress.’ ”[28]
Preemption “fundamentally is a question of congressional intent.. . .”[29] Congress can preempt state law either explicitly or implicitly.[30] “[I]n the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively”[31] or when “it actually conflicts with federal law.”[32] Nevertheless, “[i]n the final analysis, there can be no one crystal clear distinctly marked formula” to apply preemption principles in all contexts.[33] Rather, we *276 must examine congressional intent to preempt state law in the specific context of the statute or statutes at issue — in this case, how the Michigan WPA operates against the background of the NLRA and the LMRDA.
B. THE NLRA
Congress enacted the National Labor Relations Act in 1935 after it concluded that “[t]he denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest. . . ,”[34] The NLRA’s enactment “marked a fundamental change in the Nation’s labor policies.”[35] Congress replaced “[t]he earlier notion that union activity was a species of ‘conspiracy’ and that strikes and picketing were examples of unreasonable restraints of trade” with “an unequivocal national declaration of policy establishing the legitimacy of labor organization and encouraging the practice of collective bargaining.”[36]
Section 7 of the NLRA states that “[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection... ,”[37] Section 8(a)(1) states that it is an unfair labor practice for an employer “to interfere with, restrain, or coerce employees *277 in the exercise of the rights guaranteed in section 7,”[38] while § 10(a) empowers the National Labor Relations Board “to prevent any person from engaging in any unfair labor practice . . . affecting commerce.”[39]
The structure of the NLRA not only creates federal rules of decision regarding labor relations, but also delegates enforcement of that policy to an administrative agency. The United States Supreme Court has acknowledged this dual purpose of the NLRA:
[T]he unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience:
... Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes towards labor controversies. ... A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law.[40]
Indeed, the Count has explained that “nothing could serve more fully to defeat the congressional goals underlying the Act than to subject, without limitation, the relationships it seeks to create to the concurrent jurisdiction of state and federal courts free to apply the general local law.”[41]
*278 San Diego Building Trades Council v Garmon is the “watershed” case analyzing “the extent to which the maintenance of a general federal law of labor relations combined with a centralized administrative agency to implement its provisions necessarily supplants the operation of the more traditional legal processes in this field” — that is, state regulation.[42] In Garmon, the Court explained:
When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law. Nor has it mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations.[43]
Moreover, even when it is unclear “whether the particular activity regulated by the States was governed by § 7 or § 8 or was, perhaps, outside both these sections,” the Court held that “ [i]t is essential to the administration of the Act that these determinations be left in the first instance to the National Labor Relations Board.”[44] Therefore, “[wjhen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.”[45]
*279 The Court subsequently clarified the “arguably subject” standard to mean that “the party claiming preemption is required to demonstrate that his case is one that the Board could legally decide in his favor.”[46] In other words, “a party asserting pre-emption must advance an interpretation of the Act that is not plainly contrary to its language and that has not been ‘authoritatively rejected’ by the courts or the Board.”[47]
Nevertheless, the Court “has been unwilling to ‘declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions .. . .’ ”[48] To this end, Garmon recognized two related exceptions to preemption of state law regulations that are “arguably subject” to §§ 7 or 8 of the NLRA. The exceptions each “examin[e] the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme.”[49]
The first Garmon exception is “where the activity regulated [is] a merely peripheral concern” of the NLRA.[50] For example, even though the NLRA permits employers to hire replacement workers during a strike, the Court allowed a replacement worker’s breach of contract and misrepresentation claims to proceed against the employer.[51] In explaining that the agreements between employers and replacement workers *280 were only peripheral concerns of the NLRA, the Court concluded that the NLRA did not require courts “to hold that either the employer or the union is . . . free to injure innocent third parties without regard to the normal rules of law governing those relationships.”[52]
The second, and related, Garmon exception is “where the regulated conduct touch[es] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.”[53] Courts must consider whether “there exist[s] a significant state interest in protecting the citizen from the challenged conduct” and whether “the exercise of state jurisdiction over the [state] claim entail [s] little risk of interference with the regulatory jurisdiction of the [NLRB].”[54] Under this exception, the Court has held, for example, that the NLRA does not preempt certain state law claims alleging intentional torts — including threats of violence,[55] trespass,[56] intentional infliction of emotional distress,[57] malicious interference with a lawful occupation,[58] and malicious libel.[59]
When the conduct at issue in the state litigation is “arguably prohibited” by the NLRA and thus within the exclusive jurisdiction of the NLRB, the critical inquiry *281 in determining whether an exception applies “is whether the controversy presented to the state court is identical with that which could be presented to the Board.”[60] When it is identical, the Court has determined that states cannot subject violators to “a supplemental sanction for violations of the NLRA . . . .”[61]
C. THE LMRDA
Congress enacted the Labor-Management Reporting and Disclosure Act in 1959 as “the product of congressional concern with widespread abuses of power by union leadership.”[62] The United States Supreme Court explained that “allegations of union wrongdoing led to extended congressional inquiry” and resulted in “enlarged protection for members of unions paralleling certain rights guaranteed by the Federal Constitution; not surprisingly, these amendments . . . were introduced under the title of ‘Bill of Rights of Members of Labor Organizations.’ ”[63]
*282 The LMRDA’s Bill of Rights of Members of Labor Organizations protects union members’ freedom of expression and assembly:
Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization’s established and reasonable rules pertaining to the conduct of meetings!.[64]
It also provides union members with procedural protections against discipline by the union:
No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served wdth written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.[65]
“Any person whose rights secured by the [Bill of Rights of Members of Labor Organizations] have been infringed by any violation of this title may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate.”[66]
*283 In Finnegan v Leu, the Supreme Court explained that “[i]t is readily apparent, both from the language of these provisions and from the legislative history. .., that it was rank-and-file union members — not union officers or employees, as such — whom Congress sought to protect.”[67] The Court explained that when plaintiffs have “dual status as both employees and members of the Union,”[68] the LMRDA only provides a member/employee with protection from discipline in his or her capacity as a member, not in his or her capacity as an employee:
[T]he term “discipline” ... refers only to retaliatory actions that affect a union member’s rights or status as a member of the union.... In contrast, discharge from union employment does not impinge upon the incidents of union membership, and affects union members only to the extent that they happen also to be union employees.[69]
This limitation ensures “the freedom of an elected union leader to choose a staff whose views are compatible with his own.”[70] This is “an integral part” of the LMRDA’s purpose “of ensuring a union administration’s responsiveness to the mandate of the union election.”[71]
Finnegan did not examine the LMRDA in the context of preemption — no Supreme Court decision has — but several lower courts have done so. Because conduct *284 protected under the LMRDA does not extend to a union member/employee’s rights as an employee, a state-law retaliation claim brought by a union employee as an employee is preempted to the extent that it conflicts with the LMRDA’s purposes. Because “the courts have been reluctant to interfere with the right of elected union officers to select their own administrators,”[72] which is protected under the LMRDA, we likewise hold that the LMRDA preempts state law that would unduly limit the discretion of union officials to select their employees.
As a result, when a union employee brings a state-law retaliation claim as an employee, we must analyze whether the claim conflicts with the LMRDA’s “purpose and goal of protecting democratic processes in union leadership.”[73] In Packowski v United Food & Commercial Workers Local 951, for example, the Court of Appeals explained that “ [i]f union members cannot choose their leaders, or if the chosen leaders cannot implement the policies they were elected to implement, then the rights of union members (as represented by their elected leaders) would be thwarted, or at least diminished.”[74]
Nevertheless, a state-law retaliation claim is not preempted when it does not conflict with the purposes of the LMRDA. Indeed, courts have recognized that the discretion the LMRDA affords unions to choose their employees is not limitless. In Bloom v Gen Truck Drivers, Office, Food & Warehouse Union, the United *285 States Court of Appeals for the Ninth Circuit held that the LMRDA did not preempt a state claim for wrongful discharge after a union employee refused to illegally alter the minutes of a union meeting.[75] The court balanced the state’s interest in deterring crime with the purpose of the LMRDA, explaining that “[i]f federal labor law preempts such a cause of action, the deterrent effect is lost and nothing prevents unscrupulous employers from forcing employees to choose between committing crimes and losing their jobs.”[76] Furthermore, “[t]he kind of discharge alleged, retaliation for refusal to commit a crime and breach a trust, is not the kind sanctioned by the Act” to further the goals and policies of elected union officials.[77] Rather, “[protecting such a discharge by preempting a state cause of action based on it does nothing to serve union democracy or the rights of union members; it serves only to encourage and conceal such criminal acts and coercion by union leaders.”[78]
We adopt the exception to LMRDA preemption articulated in Bloom and related cases. Accordingly, we hold that the LMRDA does not preempt state wrongful-termination claims in cases in which elected union officials attempt to use their discretion as a shield to hide alleged criminal misconduct. To hold otherwise would undermine the explicit purpose of the LMRDA *286 “to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives .. . .”[79] In fact, protecting union employees from retaliation when they raise claims of criminal wrongdoing helps to protect the interests of rank-and-file union members and safeguard union democracy and, as a result, achieve the purposes of the LMRDA.
D. THE WPA
The Legislature enacted the WPA in 1980 to “ ‘provide protection to employees who report a violation or suspected violation of state, local, or federal law. . . ”[80] The WPA “remove[s] barriers that may interfere with employee efforts to report those violations or suspected violations, thus establishing a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law.”[81]
MCL 15.362 specifically regulates an employer’s retaliation against employees who report a violation or suspected violation of law:
An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee’s compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, *287 verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.
Defendants argue that federal law preempts plaintiffs’ WPA claims. Because courts examine preemption under the NLRA separately from preemption under the LMRDA, as shown earlier, we will likewise consider each federal statute separately in determining whether federal law preempts plaintiffs’ WPA actions.[82]
IV APPLICATION
A. NLRA PREEMPTION
In assessing claims of NLRA preemption, the Supreme Court has clarified that “[i]t is the conduct being regulated, not the formal description of governing legal standards, that is the proper focus of concern.”[83] The specific conduct alleged in plaintiffs’ WPA claims is that defendants unlawfully retaliated against them for their reporting of suspected wrongdoing to the United States Department of Labor. Plaintiffs’ allegations of wrongdoing fall into two general categories: (1) improper working conditions — that workers were paid unfairly and were not provided with necessary safety *288 precautions — and (2) criminality — that defendants were engaged in fraud, embezzlement, and misuse of union funds. Because a court may separate preempted claims from nonpreempted claims,[84] we will examine each category of claims separately in determining whether the NLRA preempts plaintiffs’ claims.
As stated, the threshold inquiry in determining whether the NLRA preempts state-law claims is to determine whether “an activity is arguably subject to § 7 or § 8 of the Act. . . .”[85] Among other protections, § 7 of the NLRA provides employees the right “to form, join, or assist labor organizations” and “engage in ... concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .”[86] These rights are intertwined: “Basic to the right guaranteed to employees in § 7 to form, join or assist labor organizations, is the right to engage in concerted activities to persuade other employees to join for their mutual aid and protection.”[87] Defendants claim that all of plaintiffs’ activities are “arguably subject” to § 7.
The Court has held that the “mutual aid or protection clause” in § 7 “protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums,” among other activities intended to improve working conditions.[88] Similarly, the relevant inquiry in *289 examining whether activity is “concerted” within the meaning of the NLRA is “whether the employee acted with the purpose of furthering group goals.”[89]
Plaintiffs unquestionably acted with the purpose of furthering group goals when they disputed the working conditions for union members. Their claims of unfair wages and an unsafe work environment are prototypical issues of dispute under the NLRA.[90] As a result, plaintiffs’ conduct to improve unfair wages and an unsafe work environment is arguably protected under § 7 of the NLRA. Furthermore, § 8 specifically prohibits defendants from retaliating against plaintiffs for engaging in conduct protected under § 7. Accordingly, plaintiffs’ conduct regarding working conditions satisfies the initial Garmon threshold, such that federal law would preempt state law unless one of the two exceptions applies.[91]
Moreover, neither of the two exceptions to the NLRA applies to plaintiffs’ concerted activity regarding work *290 ing conditions. First, working conditions are of central, not peripheral, concern to the NLRA’s purposes. As stated, the NLRA specifically sought to protect the right of employees to organize to improve their working conditions. Relatedly, because this protection has been central to the NLRA’s purposes for nearly 80 years, the more recent attempt of the WPA to regulate retaliation for an alleged unfair labor practice does not “touchD interests so deeply rooted in local feeling and responsibility”[92] that the Court could not infer that Congress intended the NLRB to have exclusive jurisdiction over a state whistleblower claim arising out of complaints regarding an employer’s improper working conditions. Indeed, allowing plaintiffs’ WPA claim regarding defendants’ working conditions would amount to “a supplemental sanction for violations of the NLRA,” which the NLRA prohibits.[93]
Nevertheless, in addition to their claims of retaliation for reporting working conditions, plaintiffs also make independent assertions that defendants retaliated against them for reporting allegations of criminal misconduct.[94] Plaintiffs reported to the Department of Labor and reiterated in the instant WPA complaints that union members were receiving money “paid out of the Union treasury . . . attributed to Ticket line’ duty when that clearly was not the case” and that they reported “their suspicions of fraud and illegal activity on the part of their employer.”[95] Indeed, in recognizing the potential illegal nature of the union officials’ ac *291 tions, the Department of Labor referred the matter for investigation by an Assistant United States Attorney.
While the NLRA regulates employees’ concerted activities for their mutual aid or protection, it simply does not regulate the reporting of federal and state crimes.[96] Section 7 is not so broad as to protect all employees’ concerted activities. “[A]t some point the relationship” between the concerted activity and the “employees’ interests as employees .. . becomes so attenuated that an activity cannot fairly be deemed to come within the ‘mutual aid or protection’ clause.”[97] The NLRB has explained that protection under § 7 “can be lost whenever employee communications to third parties do not relate to [the] labor practices of the employer .. . .”[98] The allegations of criminal misconduct that plaintiffs communicated to the Department of Labor do not relate to the employer’s labor practices. Rather, a state court can adjudicate the underlying allegations of embezzle *292 ment and other criminal misconduct without having to consider an employer’s labor practices or whether employees engaged in protected activity in reporting those allegations.[99] By contrast, the relationship between allegations of improper working conditions and employees’ protected activity gets to the heart of the employer’s labor practices.
The crux of the partial dissent’s disagreement with our analysis is over whether plaintiffs’ assertions of defendants’ violations of the federal laws regarding their fiduciary obligations toward the union and protecting union funds from embezzlement are arguably within the right of an employee under § 7 to “assist labor organizations.” Courts ordinarily have examined the phrase “form, join, or assist labor organizations” in § 7 in its entirety, suggesting a continuum of protections. Yet when the term “assist” has been given independent force, it appears in the context of a nonmember’s assistance to the labor organization.[100] Furthermore, *293 even when interpreting the term “assist” independently, courts have examined it in the context of the phrase “mutual aid or protection,”[101] perhaps because assisting a labor organization is supposed to be for the mutual aid or protection of the employees that it represents. For all these reasons, the partial dissent’s focus on the phrase “assisting] labor organizations” without reference to the “mutual aid or protection” analysis is unpersuasive.
Even if the underlying allegations of criminal misconduct brought to light by concerted activity arguably relate to an employer’s labor practices, enforcement of well-established criminal law is at the heart of a state’s police power and is “so deeply rooted in local feeling and responsibility”[102] that we cannot infer that Congress intended when it enacted the NLRA to relieve states from enforcing that well-established criminal law or protecting from retaliation employees who report allegations of criminal wrongdoing.[103] A state’s prohibition of adverse employment actions resulting from the reporting of suspected criminal misconduct does not “ ‘frustrate *294 effective implementation of the Act’s processes.’ ”[104] Moreover, when there are “discrete concerns of the federal scheme and the state tort law, that potential for interference is insufficient to counterbalance the legitimate and substantial interest of the State in protecting its citizens.”[105] In this case, the state has a deeply rooted and substantial interest in enforcing its criminal law,[106] which the NLRB has no authority to enforce[107] and which the WPA assists by protecting employees who report allegations of criminal misconduct.[108] Because these interests are separate from the interests articulated in the NLRA, we hold that the NLRA does not preempt the WPA with respect to *295 plaintiffs’ claims alleging retaliation for reporting defendants’ criminal wrongdoing.
B. LMRDA PREEMPTION
Defendants also assert that the LMRDA preempts plaintiffs’ WPA claims.[109] As stated, the LMRDA safeguards union democracy by protecting union members’ right to free expression and by providing democratically elected union leaders wide discretion in pursuing the policies that they were elected to accomplish. The Supreme Court held in Finnegan that “the freedom of an elected union leader to choose a staff whose views are compatible with his own” is “an integral part” of the LMRDA’s protections because an elected union leadership must be responsive “to the mandate of the union election.”[110] However, Finnegan does not stand for the proposition that the LMRDA gives an elected union leader unfettered discretion with respect to employment matters. Although the LMRDA does not provide union employees who have been terminated a cause of action for retaliation taken against them as employees, this does not lead to the conclusion that states are completely forbidden from restricting a union leader’s discretion to terminate a union employee. Rather, if a union retaliates against a union employee as an employee, then any underlying state-law retaliation claim is only preempted to the extent that it conflicts with the purposes of the LMRDA. The LMRDA is contrasted against the more expansive federal preemption doctrine *296 of the NLRA — states are afforded considerably more freedom to supplement the LMRDA federal scheme as long as no conflict arises between state law and the LMRDA.[111] Moreover, although the saving clauses of the LMRDA do not directly apply to save plaintiffs’ civil action, they do support a finding that the LMRDA both recognizes a strong state interest in protecting against criminal misconduct and implicitly approves plaintiffs’ cause of action.[112]
Accordingly, the exception to a union employer’s discretion for allegations of criminal misconduct is conclusive in this case. A union employer’s discretion in employment decisions must yield in cases in which elected union officials attempt to use that discretion as a shield to hide alleged criminal misconduct. Of course, while Bloom involved union employees who claim that they were fired for refusing to commit crimes themselves, this case involves union employees who claim that they were fired for reporting union officials’ alleged crimes. This distinction is without a difference because, in both cases, the relationship between the state-law claim and the LMRDA is identical: the union employer is retaliating against employees and, in doing so, trying to shield alleged criminal misconduct from union rank-and-file membership and the public. Moreover, in both cases, the state-law claims are consistent with the LMRDA’s expressly stated purposes of abating union corruption and breaches of trust. As a result, the LMRDA allows state-law retaliation claims to proceed in state courts. Therefore, we hold that plaintiffs’ WPA claims premised on their reporting of defendants’ al *297 leged criminal misconduct survive defendants’ assertion of LMRDA preemption.
V CONCLUSION
The Court of Appeals correctly determined that federal law did not preempt plaintiffs’ WPA claims premised on their allegations of criminal misconduct. However, the court did not distinguish these WPA claims from plaintiffs’ claims involving defendants’ working conditions. As a result, we affirm the Court of Appeals’ decision only in part. Going forward, plaintiffs may only pursue in state court their WPA claims involving retaliation for their reporting of alleged illegal conduct to a public body or bodies.[113]
Because neither the NLRA nor the LMRDA preempts plaintiffs’ WPA claims to the extent that they allege retaliation for reporting criminal misconduct such as fraud and embezzlement, state courts have subject-matter jurisdiction over those claims. Accordingly, we affirm in part the decision of the Court of Appeals and remand this case to the Wayne Circuit Court for further proceedings consistent with our opinion.
Young, C.J., and Cavanagh, Markman, McCormack, and Viviano, JJ., concurred with Kelly, J.

 MCL 15.361 et seq.

 29 USC 151 et seq.

 29 USC 401 et seq.

 29 USC 157.

 29 USC 158.

 San Diego Bldg Trades Council v Garmon, 359 US 236, 245; 79 S Ct 773; 3 L Ed 2d 775 (1959).

 29 USC 157; 29 USC 158(a)(1).

 29 USC 411(a)(1), (2), and (5).

 MCL 15.362.

 The parties dispute the nature of the TULC. Defendants characterize the TULC as a “community-focused, non-profit entity” that provides training for laid-off employees, while plaintiffs claim that it is a “private entity separate and distinct from Local 1191” that “is licensed to sell liquor.”

 Henry and White also claim that they contacted the Michigan Department of Labor, although the lower court record only contains a formal report from the United States Department of Labor.

 Defendants frame plaintiffs’ conduct in this case as primarily focused on working conditions, not about alleged criminal misconduct. However, the record belies this assertion and confirms that plaintiffs reported alleged criminal behavior to a public body. Indeed, the Department of Labor report focuses on the alleged criminal misconduct.

 Although major portions of the Department of Labor report are redacted in the record presented to this Court, including the reason that the Assistant United States Attorney declined to intervene, the report indicates that the Department of Labor considers the matter closed.

 Ramsey also claimed that Ruedisueli asked him to lie at a deposition in the Hemy/White lawsuit and that his refusal to do so constituted another reason for his termination.

 Defendants did not seek summary disposition on Ramsey’s allegation that he was terminated for refusing to lie at his deposition. As a result, it is not part of the appeal before this Court.

 MCR 2.116(C)(4).

 Henry v Laborers Local 1191, unpublished opinion per curiam of the Court of Appeals, issued July 3, 2012 (Docket Nos. 302373 and 302710).

 Id. at 5.

 Id. at 3, quoting Packowski v United Food & Commercial Workers Local 951, 289 Mich App 132, 146; 796 NW2d 94 (2010).

 Henry, unpub op at 6, citing Roussel v St Joseph Hosp, 257 F Supp 2d 280, 285 (D Maine, 2003).

 Henry v Laborers Local 1191, 493 Mich 934, 934-935 (2013). Only Local 1191 and Aaron appealed the Court of Appeals’ decision.

 Whether federal statutory law preempts state law is a question of statutory interpretation. Detroit v Ambassador Bridge Co, 481 Mich 29, 35; 748 NW2d 221 (2008).

 Travelers Ins Co v Detroit Edison Co, 465 Mich 185, 205; 631 NW2d 733 (2001).

 MCR 2.116(G)(5).

 M'Culloch v Maryland, 17 US (4 Wheat) 316, 405; 4 L Ed 579 (1819).

 US Const, art VI, cl 2.

 Cooley, Constitutional Law (1880), p 32.

 Cipollone v Liggett Group, Inc, 505 US 504, 516; 112 S Ct 2608; 120 L Ed 2d 407 (1992), quoting Rice v Santa Fe Elevator Corp, 331 US 218, 230; 67 S Ct 1146; 91 L Ed 1447 (1947).

 English v Gen Electric Co, 496 US 72, 78-79; 110 S Ct 2270; 110 L Ed 2d 65 (1990).

 Id. Of course, “when Congress has made its intent known through explicit statutory language, the courts’ task is an easy one.” Id. at 79.

 Id. Determining whether Congress intended the federal government to occupy an entire field requires examining whether “ ‘the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.’ ” Id., quoting Rice, 331 US at 230.

 English, 496 US at 79. The Court had held that federal law conflicts with state law “where it is impossible for a private party to comply with both state and federal requirements,” or “where state law ‘stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.’ ” Id., quoting Hines v Davidowitz, 312 US 52, 67; 61 S Ct 399; 85 L Ed 581 (1941).

 Hines, 312 US at 67.

 29 USC 151.

 Sears, Roebuck & Co v San Diego Co Dist Council of Carpenters, 436 US 180, 190; 98 S Ct 1745; 56 L Ed 2d 209 (1978).

 Id. The Court upheld the constitutionality of the NLRA against a Commerce Clause challenge in NLRB v Jones & Laughlin Steel Corp, 301 US 1; 57 S Ct 615; 81 L Ed 893 (1937).

 29 USC 157.

 29 USC 158(a)(1).

 29 USC 160(a).

 Garmon, 359 US at 242-243, quoting Garner v Teamsters, Chauffeurs & Helpers Local Union No 776, 346 US 485, 490-491; 74 S Ct 161; 98 L Ed 228 (1953).

 Amalgamated Ass’n of Street, Electric R & Motor Coach Employees v Lockridge, 403 US 274, 286; 91 S Ct 1909; 29 L Ed 2d 473 (1971).

 Id. at 276.

 Garmon, 359 US at 244.

 Id. at 244-245.

 Id. at 245.

 Int’l Longshoreman’s Ass’n v Davis, 476 US 380, 395; 106 S Ct 1904; 90 L Ed 2d 389 (1986).

 Id.

 Farmer v United Brotherhood of Carpenters & Joiners, 430 US 290, 295-296; 97 S Ct 1056; 51 L Ed 2d 338 (1977), quoting Lockridge, 403 US at 289.

 Farmer, 430 US at 297.

 Garmon, 359 US at 243.

 Belknap, Inc v Hale, 463 US 491, 500; 103 S Ct 3172; 77 L Ed 2d 798 (1983).

 Id.

 Garmon, 359 US at 244.

 Sears, Roebuck, 436 US at 196.

 Youngdahl v Rainfair, Inc, 355 US 131, 139; 78 S Ct 206; 2 L Ed 2d 151 (1957).

 Sears, Roebuck, 436 US at 207.

 Farmer, 430 US at 302.

 UAW v Russell, 356 US 634, 646; 78 S Ct 932; 2 L Ed 2d 1030 (1958).

 Linn v United Plant Guard Workers, 383 US 53, 62; 86 S Ct 657; 15 L Ed 2d 582 (1966).

 Belknap, 463 US at 510. Of course, a conclusion that the NLRA preempts a state law claim does not require the claim to have been presented to the NLRB. Rather, the claim is preempted if it could have been presented there and neither of the exceptions applies. Moreover, even if a claim is preempted, the NLRB may decide not to exercise its jurisdiction on a particular claim. Nevertheless, whether the NLRB will exercise its jurisdiction (or has been given an option to exercise its jurisdiction) is distinct from whether the NLRB has jurisdiction over the claim. Calabrese v Tendercare of Mich, Inc, 262 Mich App 256, 264; 685 NW2d 313 (2004).

 Wisconsin Dep’t of Indus, Labor & Human Relations v Gould Inc, 475 US 282, 288; 106 S Ct 1057; 89 L Ed 2d 223 (1986).

 Finnegan u Leu, 456 US 431, 435; 102 S Ct 1867; 72 L Ed 2d 239 (1982). The LMRDA is also known as the Landrum-Griffin Act. Black’s Law Dictionary (9th ed), p 957. One of the LMRDA’s principal coauthors, then Representative Robert E Griffin, served on this Court from 1987 to 1994.

 Finnegan, 456 US at 435.

 29 USC 411(a)(2).

 29 USC 411(a)(5).

 29 USC 412. The LMRDA also contains two saving provisions. The title containing the Bill of Rights specifies that “[n]othing contained in this title shall limit the rights and remedies of any member of a labor organization under any State or Federal law or before any court or other tribunal, or under the constitution and bylaws of any labor organization.” 29 USC 413. Additionally, the LMRDA generally states:
Except as explicitly provided to the contrary, nothing in this Act shall reduce or limit the responsibilities of any labor organization or any officer, agent, shop steward, or other representative of a labor organization, or of any trust in which a labor organiza *283 tion is interested, under any other Federal law or under the laws of any State, and, except as explicitly provided to the contrary, nothing in this Act shall take away any right or bar any remedy to which members of a labor organization are entitled under such other Federal law or law of any State. [29 USC 523(a).]

 Finnegan, 456 US at 436-437.

 Id. at 437.

 Id. at 437-438.

 Id. at 441.

 Id.

 Cehaich v UAW, 710 F2d 234, 239 (CA 6, 1983).

 Packowski, 289 Mich App at 149.

 Id. Because the instant WPA claims implicate allegations of criminal wrongdoing not existing in Packowski, we need not — and do not— determine the validity of the LMRDA preemption doctrine used by the Court of Appeals in Packowski.

 Bloom v Gen Truck Drivers, Office, Food & Warehouse Union, 783 F2d 1356 (CA 9, 1986).

 Id. at 1361

 Id. at 1362.

 Id. Similarly, two years after Bloom, the Colorado Court of Appeals held that the LMRDA did not preempt a state-law wrongful-discharge claim “insofar as [the plaintiff] allege[d] that he was discharged because he refused to aid [the union’s business manager] in his alleged criminal misuse of union funds.” Montoya v Int’l Brotherhood of Electrical Workers Local Union III, 755 P2d 1221, 1224 (Colo App, 1988).

 29 USC 401(c). See also 29 USC 401(b) (finding that “there have been a number of instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct”).

 Whitman v City of Burton, 493 Mich 303, 312; 831 NW2d 223 (2013), quoting the title of 1980 PA 469.

 Whitman, 493 Mich at 312, citing Dolan v Continental Airlines/Continental Express, 454 Mich 373, 378-379; 563 NW2d 23 (1997).

 Although defendants raised this issue of NLRA preemption for the first time before the Court of Appeals, preemption is a question of subject-matter jurisdiction. As such, this Court must consider it. Davis, 476 US at 393 (“A claim of Garmon pre-emption is a claim that the state court has no power to adjudicate the subject matter of the case, and when a claim of Garmon pre-emption is raised, it must be considered and resolved by the state court.”).

 Lockridge, 403 US at 292.

 See Farmer, 430 US at 301-302 (noting that a rigid application of Garmon might support the conclusion that the “entire action was preempted by federal law” but in this case allowing only a claim of intentional infliction of emotional distress to proceed in state court).

 Garmon, 359 US at 245.

 29 USC 157.

 NLRB v Drivers, Chauffeurs, Helpers, Local Union No 639, 362 US 274, 279; 80 S Ct 706; 4 L Ed 2d 710 (1960).

 Eastex, Inc v NLRB, 437 US 556, 566; 98 S Ct 2505; 57 L Ed 2d 428 (1978).

 Compuware Corp v NLRB, 134 F3d 1285, 1288 (CA 6, 1998).

 See Platt v Jack Cooper Transp, Co, Inc, 959 F2d 91, 94 (CA 8, 1992) (“Platt’s claim that he was discharged in retaliation for making safety complaints satisfies the threshold test for Garmon preemption.”).

 Plaintiffs argue that union members were not employees within the meaning of the NLRA and that, as a result, they were not engaging in concerted activities. Rather, plaintiffs characterize the union members who worked on the TULC project as volunteers who are not protected by the NLRA. Indeed, the NLRB has stated that unpaid volunteers are not employees within the meaning of the NLRA because “there is no economic aspect to their relationship with the Employer, either actual or anticipated.” WBAI Pacifica Foundation and United Electrical, Radio & Machine Workers of America, 328 NLRB 1273, 1275 (1999). Nevertheless, we reject this argument as it applies to plaintiffs. The union members who worked on the TULC project did have an economic aspect to their relationship with the union — they were engaged in work for hire and “receive[d] compensation for labor or services” in the amount of $30 a day. Id. More importantly, there is no question that plaintiffs were employees within the meaning of the NLRA and that they were allegedly retaliated against for complaining to their employer about its labor practices.

 Garmon, 359 US at 244.

 Gould, 475 US at 288.

 These assertions are independent in the sense that they do not rely on the working-condition assertions for their validity and, accordingly, can he assessed separately from them.

 The Department of Labor’s investigation report corroborates this claim and states that the department investigated allegations that Aaron “stole or misused strike/picket funds.”

 That the Department of Labor referred the matter to the United States Attorney’s office corroborates this claim. While the partial dissent correctly identifies 29 USC 501(c), the federal law prohibiting embezzlement from a union, as relevant to this case, its significance as a criminal offense outside the NLRA shows why reporting a suspected violation of 29 USC 501(c) does not arguably fall within the protections of the NLRA. Significantly, while the NLRB “is empowered ... to prevent any person from engaging in any unfair labor practice,” 29 USC 160(a), the power of the NLRB does not extend to enforce 29 USC 501(c) or, indeed, any criminal law. See Republic Steel Corp v NLRB, 311 US 7, 10; 61 S Ct 77; 85 L Ed 6 (1940) (stating that the NLRA “does not carry a penal program declaring the described unfair labor practices to be crimes” and “does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees”).

 Eastex, 437 US at 567-568.

 Handicabs, Inc and Trail, 318 NLRB 890, 896 (1995). The fact that the NLRB provided nonexclusive examples of unprotected conduct when stating this rule does not render the rule any less relevant to this circumstance — there must be a relationship between the communication and the employees’ interests as employees.

 Indeed, one hypothetical scenario suffices to illustrate why this is so. Suppose that plaintiffs’ claim of improper wage and unsafe working conditions simply did not exist and, instead, that defendants paid union members a bargained-for wage and the members repaired the TULC building under safe working conditions. In this scenario, plaintiffs would still be able to allege that defendants misappropriated union funds for unlawfully paying those union members their bargained-for wage out of the picket fund when the members did not actually engage in picket duty and that defendants received illegal kickbacks from the TULC. By stripping away plaintiffs’ claims of unsafe working conditions and unfair wages that are preempted by the NLRA, it becomes clear that plaintiffs’ criminal-misconduct claims exist independently.

 Southern Greyhound Lines and Anderson, 169 NLRB 627, 628 (1968) (“It is well settled that Section 7 of the Act protects an employee in his right to assist a labor organization regardless of whether he is eligible for membership in it. . . .”). See also Signal Oil & Gas Co v NLRB, 390 F 338, 343 (CA 9, 1968) (affirming the trial *293 examiner’s finding that the employee’s prounion speech “ ‘may he regarded as an expression of support for the proposed union activity of his fellow employees, made in anticipation that he or his group might receive similar support should the occasion arise’ ”).

 NLRB v Rockaway News Supply Co, 197 F2d 111, 113 (CA2, 1952) (stating that a nonmemher’s refusal to cross a picket line ‘‘is frequently of assistance to the labor organization whose picket line is respected, and it is in a broad but very real sense directed to mutual aid or protection"), aff'd 345 US 71 (1953) (emphasis added).

 Garmon, 359 US at 244.

 See, e.g., Metro Life Ins Co v Massachusetts, 471 US 724, 756; 105 S Ct 2380; 85 L Ed 2d 728 (1985) (holding that the NLRA does not preempt state police power even to the extent that the police power prescribes minimum labor standards applicable to employers).

 Int’l Ass’n of Machinists & Aerospace Workers v Wisconsin Employment Relations Comm, 427 US 132, 148; 96 S Ct 2548; 49 L Ed 2d 396 (1976), quoting Brotherhood of R Trainmen v Jacksonville Terminal Co, 394 US 369, 380; 89 S Ct 1109; 22 L Ed 2d 344 (1969).

 Farmer, 430 US at 304.

 In addition to alleging violations of federal criminal statutes, plaintiffs also alleged violation of MCL 750.174, the state-law crime of embezzlement.

 Republic Steel, 311 US at 10 (“[The NLRA] does not prescribe penalties or fines in vindication of public rights or provide indemnity against community losses as distinguished from the protection and compensation of employees.”).

 The partial dissent cites Kilb v First Student Transp, LLC, 157 Wash App 280; 236 P3d 968 (2010), for the proposition that the NLRA preempted a state-law retaliation claim alleging that the plaintiff was discharged for attempting to assist a union. However, the retaliation in Kilb did not implicate the state’s interest in enforcing its criminal law. Rather, the plaintiff claimed that he was discharged from his supervisory position for refusing to undertake antiunion tactics and that “his discharge violated the right of employees to organize and form unions, ... in contravention of Washington State’s clearly established public policy against interfering with these rights.” Id. at 284 (citation omitted). Unlike here, then, the conduct at issue in Kilb was directly within the NLRA’s protections. Id. at 288 (“An employer’s discharge of a supervisor for refusing to commit unfair labor practices is, at least arguably, a violation of [29 USC 158(a)(1)].”).

 Because we hold that the NLRA preempts plaintiffs’ WPA claims to the extent that they allege defendants’ unfair labor practices related to working conditions, we need not examine those preempted claims within the context of the LMRDA. Accordingly, our analysis of the LMRDA focuses only on plaintiffs’ claims relating to their allegations of defendants’ criminal activity.

 Finnegan, 456 US at 441.

 We also note that, unlike the NLRA, the LMRDA does not create a separate administrative hoard to consider violations of its provisions. Rather, it creates a cause of action that a union member may pursue in a district court of the United States. 29 USC 412.

 See Bloom, 783 F2d at 1361-1362.

 As stated, this decision does not involve Ramsey’s separate and individual allegation that he was terminated for refusing to peijure himself.