*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

GENERAL MOTORS, LLC, and GENERAL
MOTORS COMPANY,

      Plaintiffs-Appellees,

v

ALPHONS IACOBELLI,

      Defendant-Appellant,

and

FCA US, LLC, and STELLANTIS, NV, formerly
known as FIAT CHRYSLER AUTOMOBILES,
NV,

      Defendants-Appellees,

and

JEROME DURDEN,

      Defendant.

FOR PUBLICATION
May 11, 2026
11:42 AM

Nos. 370051; 371977
Wayne Circuit Court
LC No. 20-011998-CB

GENERAL MOTORS, LLC, and GENERAL
MOTORS COMPANY,

      Plaintiffs-Appellees,

v

ALPHONS IACOBELLI,

      Defendant,

and

No. 373660
Wayne Circuit Court
LC No. 20-011998-CB

-1-

FCA US, LLC, and STELLANTIS, NV, formerly
known as FIAT CHRYSLER AUTOMOBILES,
NV,

         Defendants-Appellees,

and

JEROME DURDEN,

         Defendant,

and

SUSANNE IACOBELLI,

         Appellant.

Before:  GADOLA, C.J., and MURRAY and M. J. KELLY, JJ.

MURRAY, J.

We granted leave to appeal in these consolidated matters to address a preemption issue, as well as several discovery issues that involve constitutional and statutory privilege questions.  In the challenged orders, the trial court ruled that defendant Alphons Iacobelli did not, during his deposition, properly invoke his Fifth Amendment right against self-incrimination, and could not invoke the statutory spousal privilege as a way in which to avoid answering questions.  The trial court also ruled that nonparty-appellant Susanne Iacobelli, Alphons' spouse, could not invoke the spousal privilege when refusing to produce handwritten notes regarding conversations with her husband.  We affirm.

## I. BACKGROUND FACTS

These appeals arise from a case involving allegations that the FCA Defendants[1] embarked on a systemic and near decade-long conspiracy to bribe certain senior union officials, corrupt the collective-bargaining process, and weaken plaintiff General Motors to the point that it would agree to merge with FCA.  GM alleges that FCA gained competitive advantages when it came to union wages and labor peace, causing GM to suffer billions of dollars in damages.  Iacobelli was a lead union-bargaining representative for FCA from 2008 to mid-2015, serving as FCA's Vice President of Labor Relations and the Director of the United Auto Workers-Chrysler Skill Development and Training Program, doing business as the UAW-Chrysler National Training Center (the NTC).

---

[1] Defendants FCA US, LLC, and Stellantis, NV.

There is no dispute that certain FCA employees made improper payments to and on behalf of certain UAW officials, resulting in a federal corruption investigation and the prosecution of 15 individuals working for either FCA or the UAW. There is also no dispute that Iacobelli, as the Director of the NTC, was at the center of the scheme.

Iacobelli's employment with FCA ended in mid-2015, before the scheme became public. However, GM alleges that, in furtherance of the scheme, in June 2015, former UAW President Dennis Williams selected then-UAW Vice President, Joseph Ashton, as well as Iacobelli, to serve in high-level positions within GM, which they used to provide FCA with GM's confidential information. In other words, GM alleges that Iacobelli was an FCA informant when he worked for GM. Iacobelli and Ashton were alleged to have concealed the conspiracy so that GM did not discover it earlier. GM alleged that the FCA defendants used foreign bank accounts to make secret payments to Iacobelli and the other individuals who were allegedly passing information about GM to FCA.

Iacobelli worked at GM from early 2016 until mid-2017, when he was indicted on criminal charges relating to the bribery of union officials while he worked for FCA. For their part, the FCA Defendants acknowledge that Iacobelli and other individuals improperly utilized NTC funds to make lavish personal purchases but maintain that they did so without FCA's permission or knowledge. More broadly, they denied the allegations that Iacobelli was acting on FCA's behalf once he left the company or that there was any scheme to harm GM. They maintained instead that this lawsuit was a mechanism designed to upset a merger between FCA and French automaker Peugeot.

In November 2015, a team of Assistant United States Attorneys sent a proffer letter to Iacobelli's criminal defense attorney in connection with a proposed plea agreement relating to the bribery scheme. The proffer letter outlined the terms of an earlier discussion, which included the following:

> (1) Your client agrees to make a complete and truthful statement of his knowledge of and role in the matters under investigation, and to fully and truthfully answer all questions. This means, for example, that your client may not omit facts about crimes, other participants, or his involvement in the offenses, and must volunteer all information that is reasonably related to the subjects discussed in the debriefing.

* * *

> (8) If your client fails to provide truthful and complete information (such as by making a false statement, providing false information, omitting facts or otherwise misleading the government), there are no restrictions on the government's use of any statements made by your client or information provided by you or your client. The government may then also bring additional charges against your client based upon the failure to provide truthful and complete information, such as perjury, obstruction of justice and false statements charges.

Iacobelli and his counsel signed the letter and agreed to its terms. Three years later, Iacobelli was indicted in the United States District Court for the Eastern District of Michigan on charges of conspiracy to violate the Labor Management Relations Act (LMRA) (also known as the Taft-Hartley Act), 18 USC 371; paying and delivering prohibited money and things of value to union officials, 29 USC 186(a)(2) and (d)(1); conspiracy to defraud the United States, 18 USC 371; subscribing false tax returns, 26 USC 7206(1); and willful failure to file a tax return, 26 USC 7203. The indictment alleged that between January 2009 and July 2015, Iacobelli and other individuals willfully paid and delivered more than $1.2 million in payments and things of value to UAW officials through the NTC. The payments were used for travel expenses, a home mortgage, and payments to a nonprofit organization affiliated with a UAW official. The indictment further alleged that Iacobelli and others conspired to defraud the United States from collecting and assessing taxes and filed fraudulent tax returns in relation to the improper payments. Iacobelli allegedly filed false tax returns for tax years 2012 through 2015 in his personal capacity.

Iacobelli subsequently entered into a plea agreement with the United States Department of Justice under FR Crim P 11, in which he pleaded guilty to subscribing a false tax return, 26 USC 7206(1), and conspiracy to violate the LMRA, 18 USC 371. The plea agreement outlined the following factual basis for the plea:

> 7. Between in or before January 2009 and continuing through in or after June 2015, Alphons Iacobelli knowingly and voluntarily joined a conspiracy in which FCA and FCA executives and FCA employees agreed to pay and deliver, and willfully paid and delivered, money and things of value to officers and employees of the UAW. As part of that conspiracy, Alphons Iacobelli and other FCA executives and FCA employees acting in the interest of employer FCA used the bank accounts and credit card accounts of the NTC to benefit officers and employees of the UAW, knowing that those individuals were not permitted to receive the money and other things of value.

These unlawful payments included $1.5 million in prohibited payments to various UAW entities and officials, which were made "in an effort to obtain benefits, concessions, and advantages for FCA in the negotiation, implementation, and administration of the collective bargaining agreements between FCA and the UAW." As it related to the subscribing of a false tax return, Iacobelli admitted that he "received hundreds of thousands of dollars in compensation from the NTC, which compensation was falsely and fraudulently omitted from tax returns filed with the Internal Revenue Service." For tax year 2015, Iacobelli failed to report $861,927 in additional income.

The plea agreement incorporated by reference a cooperation agreement that Iacobelli signed the same day. The plea agreement explained:

> The government agrees to bring no additional criminal charges against defendant Alphons Iacobelli arising out of his involvement in the offenses charged in the First Superseding Indictment, or for additional criminal conduct disclosed

under the terms of the December 15, 2017 cooperation agreement, unless the defendant withdraws his plea or breaches that cooperation agreement.[2]

In the cooperation agreement, Iacobelli agreed "to assist the United States Attorney's Office in the investigation and prosecution of others involved in criminal activities," as detailed in the agreement. He agreed to provide the United States Attorney's Office with "truthful and complete information" relating to "conspiracy, prohibited payments to union officials, embezzlement, wire fraud, honest services fraud, theft of union assets, commercial bribery, extortion, money laundering, obstruction of justice, and all related criminal activities." He also agreed to provide truthful testimony at all criminal and civil proceedings. In exchange, the government would seek a downward departure or reduction of his sentence. The agreement provided:

> In exchange for defendant's agreement to cooperate with the government, as outlined above, the United States Attorney's Office agrees not to use any new information that defendant provides pursuant to this agreement as the basis for initiating additional criminal charges beyond those set forth in the Information in this matter. There shall be no such restrictions on the use of information: (1) previously known to law enforcement agencies; (2) revealed to law enforcement agencies by, or discoverable through, an independent source; (3) concerning criminal activities about which defendant claims to have no knowledge or involvement; or (4) in the event there is a breach of this agreement.

An exception existed if Iacobelli breached the agreement by taking actions or making statements that are inconsistent with his continued cooperation under the agreement, such as criminal activity or "other conduct which in any way undermines the effectiveness of defendant's cooperation."

In connection with the federal criminal matter, in September 2020, Iacobelli also signed a declaration relating to foreign bank accounts, in which he declared under penalty of perjury, in relevant part, that:

> 2. I am aware that the General Motors Company has alleged in a civil lawsuit that I controlled bank accounts in countries outside of the United States.

> 3. In fact, however, I have never opened, maintained, or controlled a bank account outside of the United States.

> 4. I have never opened, maintained, or controlled a bank account in my name, in my wife's name, in the name of Business Advisory Group, or in the name of any other business under my control in Italy, Singapore, Switzerland, or Lichtenstein.

---

[2] The agreement added, "Unless otherwise indicated, this agreement does not bind any government agency except the United States Attorney's Office for the Eastern District of Michigan."

5. I have never opened, maintained, or controlled a bank account in my name, in my wife's name, in the name of Business Advisory Group, or in the name of any other business under my control with Deutsche Bank, UBS, Credit Suisse, DBS Bank, Vaduz Bank, or VP Bank.

6. My wife, Susan [sic] Iacobelli, has never opened a bank account for me, for herself, or for a business that I controlled or had an interest in outside of the United States. I have never directed my wife, Susan [sic] Iacobelli, to take control of any bank account that I had previously controlled in any country outside of the United States.

Susanne signed a nearly identical declaration with the same representations about foreign bank accounts.

GM filed two prior actions in relation to the same events, both filed in United States District Court for the Eastern District of Michigan, Case Nos. 2:19-cv-13429 and 2:20-cv-12556, that are no longer pending. In the 2019 case, GM raised state-law claims, as well as a claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 USC 1961 *et seq.*, under the theory that FCA bribed the UAW to obtain competitive advantages that were withheld from GM, which caused harm to GM. *Gen Motors, LLC v FCA US, LLC*, 44 F4th 548, 556, 559 (CA 6, 2022). The federal court declined to exercise supplemental jurisdiction over GM's state-law claims, *id*. at 556, and dismissed the complaint on the basis that GM could not establish causation. The United States Court of Appeals for the Sixth Circuit held that the NLRB did *not* have exclusive jurisdiction over GM's RICO claim and that the federal district court did have jurisdiction to adjudicate the claim, and upheld the dismissal on appeal. *Id*. at 562-568.

GM then filed this lawsuit in the Wayne Circuit Court, raising claims for (1) fraudulent misrepresentation against the FCA Defendants, (2) silent fraud (fraud by omission) against the FCA Defendants, (3) fraudulent misrepresentation against Iacobelli, (4) silent fraud (fraud by omission) against Iacobelli, (5) breach of fiduciary duty against Iacobelli, (6) aiding and abetting breach of fiduciary duty against the FCA Defendants, (7) unfair competition against the FCA Defendants, and (8) civil conspiracy against all defendants.

After an unsuccessful attempt at removing the case on the basis of federal diversity jurisdiction, the FCA Defendants moved for summary disposition, arguing that (1) the complaint did not plead a valid claim for relief, (2) the federal court already ruled that the basis for GM's claims was not plausible, and (3) the claims were preempted by the exclusive jurisdiction of the NLRB. Iacobelli likewise moved for summary disposition, also arguing that the claims fell within the exclusive jurisdiction of the NLRB and that, alternatively, the claims against himself should be dismissed for failure to state a claim.

Not surprisingly, GM responded, in relevant part, that its claims were not preempted because it did not allege a claim for bad-faith bargaining, but did allege tortious conduct targeting GM. Additionally, an exception to preemption applied because the claims were deeply rooted in local feelings and responsibilities such that it could not be presumed that Congress intended to preempt state law in relation to GM's claims. GM noted that the FCA Defendants failed to cite a

single provision of the NLRA that would apply to GM's claims and argued the complaint did not attack the bargaining process and was not seeking damages on the part of UAW members.

Relevant to this appeal, the trial court held that the first-amended complaint failed to state valid claims for relief because the damages were hypothetical in nature and GM would not be able to establish causation. The court did not decide the preemption question. GM moved for reconsideration, providing for the first time the affidavit of Peter DeLorenzo, who stated that Iacobelli admitted to participating in "the biggest corporate corruption case in US business history," and provided numerous details about the scheme, explaining that the "end game" of the scheme was to "make a move on GM to force a merger." The court granted the motion for reconsideration and permitted GM to file a second-amended complaint with new allegations based on the affidavit.

Iacobelli and the FCA Defendants both moved for summary disposition of the second-amended complaint, which the trial court granted in part and denied in part. The motions for summary disposition raised a variety of arguments, including a renewed preemption argument under *San Diego Building Trades Council v Garmon*, 359 US 236; 79 S Ct 773; 3 L Ed 2d 775 (1959). With respect to the preemption issue, the court ruled as follows:

> This Court doesn't believe that GM's claims are preempted or that [*Garmon*] comes into play at this point. As we've stated earlier the NLRA was designed to protect employee rights, neither FCA nor Iacobelli could point to any case where there would be titled [*General Motors v FCA*] in an NLRB proceeding. It certainly would be unprecedented and in any event Mr. Iacobelli wouldn't be subject to going to the NLRB as to General Motors['s] allegations against him.

> The Defendant argue [sic] that there is this preemption because the claims are predicated on bad faith bargaining, that's kind of half the story, certainly bad faith bargaining, but GM hasn't necessarily alleged just a bad faith bargaining Complaint or claim.

After the case proceeded to discovery, the trial court appointed retired judge Lita Popke to serve as a discovery facilitator. Iacobelli objected to GM's first set of interrogatories on the basis of both his Fifth Amendment right to be protected from self-incrimination, and the spousal privilege. According to Iacobelli, his plea agreement in the federal criminal case did not provide blanket immunity or otherwise bar his assertion of his right to be protected from self-incrimination. GM moved to compel Iacobelli's answers to the interrogatories.

The discovery facilitator heard the motion to compel, and suggested that Iacobelli's assertion of spousal privilege was too broad. Regarding self-incrimination, the facilitator suggested that she was not provided with all the facts to establish why the discovery responses would create a risk for further criminal prosecution, and conducted an *in camera* review on the issue. Following the *in camera* proceeding on the Fifth Amendment issue, the facilitator recommended that (1) spousal privilege could not be raised in relation to the interrogatories because the privilege only applied to an examination in court (and not to written discovery), and (2) Iacobelli's assertion of the Fifth Amendment privilege could not be evaluated until his deposition.

The spousal privilege issue was raised again during a motion hearing before the trial court. After hearing arguments from both counsel, the court ruled that Iacobelli did not establish that the interrogatory responses were covered by the spousal privilege considering the privilege had to be construed strictly, the interrogatories did not amount to in-court testimony, and they did not relate to Susanne.

During his deposition Iacobelli invoked his privilege against self-incrimination almost 500 times, and on 20 occasions he refused to answer questions on the basis of spousal privilege. The objections generally centered around the following topics:

- Questions regarding the details and scope of Iacobelli's plea agreement, particularly regarding certain individuals who may have been involved in the conspiracy.

- Questions regarding the alleged bribery scheme, as well as Iacobelli's knowledge of the details of the scheme.

- Questions involving Iacobelli's involvement in the 2015 collective-bargaining process and FCA's possible motives to merge with GM.

- Questions involving whether Iacobelli held money in any foreign bank accounts in his own name or in Susanne's name.

- Questions regarding why Iacobelli's employment at FCA ended in 2015 and why he decided to seek employment at GM.

- Questions about alleged misconduct at GM or in GM's Center for Human Resources (CHR), as well as meetings between Iacobelli and GM officials.

- Questions about whether Iacobelli passed GM's confidential information to FCA while working at GM.

- Questions about alleged inaccuracies in DeLorenzo's affidavit, as well as related questions about their conversation.

- Questions about improvements that were made to Iacobelli's home, a red Ferrari Spider, and other personal and credit card expenses, presumably paid for by the NTC.

- Questions about donations Iacobelli made to his son's high school, Brother Rice High School, presumably through the use of NTC funds.

Iacobelli also declined to answer 20 questions about Susanne on the basis of "spousal privilege."

At the discovery facilitator's invitation, GM and the FCA Defendants filed briefs regarding 489 instances of Iacobelli's invocation of the Fifth Amendment privilege during his deposition. According to the facilitator's summary of the arguments, GM and the FCA Defendants asserted that Iacobelli's invocation of his Fifth Amendment privilege was overbroad as Iacobelli already pleaded guilty in relation to the bribery scheme, and thus there was no tangible, genuine, or substantial risk of prosecution. For their part, the FCA Defendants sought to compel Iacobelli's

answers relating to five categories of information it sought during his deposition: (1) Iacobelli's alleged misappropriation of funds from the NTC, (2) Iacobelli's communications with FCA after his employment with the company ended, (3) alleged inaccuracies in DeLorenzo's affidavit, (4) alleged foreign bank accounts, and (5) alleged misconduct at GM or the CHR.

Iacobelli responded to GM's motion, arguing that (1) the fact that he pleaded guilty to two crimes in federal court did not prohibit him from invoking his Fifth Amendment privilege in this case, (2) he did not need to prove a risk of incrimination to invoke the Fifth Amendment privilege, and (3) an Assistant United States Attorney recently told the trial court that the criminal investigation remained ongoing. Thus, Iacobelli was not immune from prosecution. In the alternative, he argued the facilitator should conduct an *in camera* review of additional information, such as an explanation from counsel regarding why Iacobelli invoked his Fifth Amendment privilege in response to certain questions.

As for the FCA Defendants' motion, Iacobelli argued he did not have immunity from prosecution in other federal jurisdictions and that the cooperation agreement would not provide complete immunity. He had a reasonable apprehension of incrimination in relation to each invocation of privilege considering the broad allegations against the FCA Defendants and Iacobelli.

In mid-November 2023, GM served a subpoena *duces tecum* on Susanne, requesting 27 categories of documents. Susanne moved to quash the subpoena, arguing that the same documents were requested in related federal litigation known as the *Ashton* cases[3] and that the subpoena was unreasonable and disproportionate to the needs of this case.

The discovery facilitator issued a report and recommendation on GM's and the FCA Defendants' motions to compel. The facilitator categorized her findings on the invocations of privilege into five categories: (1) the invocation of privilege is barred by "selective waiver" (Category 1), (2) the invocation was proper because there existed a reasonable risk that Iacobelli could be prosecuted for perjury (Category 2), (3) the invocation was improper because the answers did not pose a reasonable risk of prosecution or there existed an imaginary fear of prosecution (Category 3), (4) the invocation of the privilege was not proper because the answers were protected by plea agreement or the cooperation agreement (Category 4), and (5) the invocation of the privilege was not proper because Iacobelli did not face a reasonable risk of prosecution for potential crimes barred by the statute of limitations (Category 5). The facilitator included a detailed chart outlining each instance in which defendant invoked the Fifth Amendment privilege during his deposition, the positions taken by GM and the FCA Defendants in relation to the privilege, and the facilitator's recommendations for each invocation of privilege.

Relating to Category 1, the facilitator concluded that numerous instances existed in which Iacobelli answered a question voluntarily but then refused to provide further details when asked follow-up questions. For Category 2, which represented a small subset of questions, the facilitator

---

[3] *Gen Motors, LLC v Ashton*, United States District Court for the Eastern District of Michigan Case No. 22-mc-50034; *Gen Motors, LLC v Ashton*, United States District Court for the District of New Jersey Case No. 20-cv-12659.

concluded that there were certain instances in which Iacobelli properly invoked the Fifth Amendment because there was a reasonable risk of future prosecution for perjury. More specifically, the facilitator agreed with Iacobelli's argument that a possibility existed that if he were to answer the questions about the foreign bank accounts in a manner inconsistent with his earlier representations, he could be prosecuted for perjury. The facilitator concluded that because there was no evidence that an absolute bar existed for prosecution for perjury (and the statute of limitations had not run), the court should conclude that Iacobelli's invocation of the Fifth Amendment was proper.

For Category 3, the facilitator concluded that Iacobelli refused to answer several deposition questions relating to the activities of other individuals. Because he could not be prosecuted for the conduct of others, his invocation of the Fifth Amendment was not justified. This would include questions about misconduct at GM or the CHR that occurred before he joined the company. As for Category 4, involving whether Iacobelli faced a reasonable risk for prosecution when considering the language of his plea agreement and the cooperation agreement, the facilitator reasoned that Iacobelli's fear of prosecution in other jurisdictions was not reasonable. The facilitator reasoned that because all the alleged bribery and kickback schemes involved in this case arose in Michigan, there was no reasonable risk that Iacobelli could be prosecuted in any other states. Furthermore, the prosecution of crimes arising out of the bribery scheme would be barred by a five-year limitations period for noncapital offenses outlined in 18 USC 3282, and Michigan's six-year criminal limitations period outlined in MCL 767.24(10). For this same reason, as to Category 5, the facilitator reasoned that there was no reasonable risk of future prosecution in relation to the bribery or kickback scheme because the federal and state limitations periods expired.

Iacobelli objected to the discovery facilitator's December 11, 2023 report and recommendation and moved the court to set it aside. The trial court, however, largely adopted the facilitator's recommendation. With respect to selective waiver, the court explained that "a witness cannot set forth certain testimony and then withdraw from the crossfire of interrogation before the reliability of his testimony has been fully tested." Rather, "[w]hen a witness voluntarily testifies about a subject, the waiver of any Fifth Amendment right extends to any matter within the scope of relevant cross examination, including matters affecting the witness's credibility." The court also concluded that the responses to the questions "would pose no real danger of prosecution," noting that the facilitator used the correct legal standard by examining whether there existed a genuine threat of prosecution. Additionally, the court ruled that Iacobelli failed to identify a single offense for which the limitations period had not expired. The facilitator, according to the court, was not required to accept his claim of apprehension of a real danger of incrimination at face value. With respect to the foreign bank accounts, the court found that they fell within the scope of the selective waiver because Iacobelli affirmatively offered testimony on the subject. The court therefore adopted the report and recommendation in all respects except that it overruled the privilege assertion in relation to GM's and FCA's questions concerning foreign bank accounts.

GM and the FCA Defendants then moved to compel Iacobelli's answers to the 20 deposition questions he refused to answer on the basis of spousal privilege. The facilitator issued a report and recommendation regarding Iacobelli's assertion of spousal privilege, recommending that the court rule that spousal privilege did not apply and that Iacobelli should be required to answer the 20 deposition questions. The facilitator found that Iacobelli's argument that spousal privilege could apply outside of court was incorrect and contrary to the court's prior ruling in

relation to the interrogatories. Even if it were correct, the testimony would not be " 'for or against his wife,' " as required for the spousal privilege to apply.

In that regard, the testimony would not disfavor Susanne's legal interests in this case because she was not a party to the case, and any prosecution of Susanne in relation to the embezzlement scheme would be time-barred under the five-year federal limitations period for noncapital offense outlined in 18 USC 3282 or the six-year criminal limitations period outlined in MCL 767.24(10). The same was true in relation to any potential tax fraud charges which were subject to a six-year limitations period, 26 USC 6531(2). Thus, because there was no conceivable risk of prosecution to Susanne, Iacobelli could not invoke spousal privilege for any of the 20 deposition questions.

Iacobelli objected to the report and recommendation and moved the trial court to reject it. The court ruled in favor of GM and the FCA Defendants, explaining that any crimes for which Susanne could be implicated were time-barred and that the spousal privilege would not otherwise apply because Susanne was not a party to the action. Thus, Iacobelli's testimony would not be against her legal interests.

Before the trial court ruled on Susanne's motion to quash GM's subpoena, GM moved the trial court to compel Susanne's compliance with its subpoena. At issue was Susanne's continued withholding of handwritten notes of her conversations with Iacobelli, which GM argued was not covered by the spousal privilege. The facilitator found that Susanne did not properly invoke the spousal privilege under MCL 600.2162(1) because she was not examined as a witness "for or against" Iacobelli without his consent. Nor was she testifying in a court proceeding under oath. The facilitator further found that the subpoena did not contain "testimonial aspects" for purposes of the Fifth Amendment act-of-production doctrine because the authenticity or existence of the notes was not at issue. And, the doctrine had only been used in the Fifth Amendment context and not in the context of spousal privilege. The facilitator recommended the court grant GM's motion to compel production of the notes.

The court adopted the facilitator's recommendation and granted the motion to compel disclosure of the notes. The court ruled that the spousal privilege is testimonial in nature and "limited to those situations in which a spouse is being examined in court proceedings." The court explained that it previously rejected a broad application of spousal privilege and found that the doctrine should be strictly construed to apply to testimony, only. The court held that the act-of-production doctrine applying to Fifth Amendment privilege in the federal context did not apply to spousal privilege because Susanne's notes were not considered testimony and there was no dispute that the notes existed and were relevant to the claims.

## II. ANALYSIS

### A. PREEMPTION

Before addressing the discovery issues, we first turn to whether the NLRA preempts the claims brought by GM, thus depriving the trial court of subject-matter jurisdiction to resolve this dispute.

This Court reviews de novo both the issue whether the trial court has subject-matter jurisdiction, *Forest Hills Coop v Ann Arbor*, 305 Mich App 572, 616; 854 NW2d 172 (2014), and the trial court's ruling on a motion for summary disposition, *Ass'n of Home Help Care Agencies v Dep't of Health & Human Servs*, 334 Mich App 674, 684; 965 NW2d 707 (2020). A motion under MCR 2.116(C)(4) examines whether the trial court has subject-matter jurisdiction and encompasses issues of federal preemption of state law. *Henry v Laborers' Local 1191*, 495 Mich 260, 273; 848 NW2d 130 (2014). "In deciding whether to grant a motion for summary disposition pursuant to MCR 2.116(C)(4), a court must consider [t]he affidavits, together with the pleadings, depositions, admissions, and documentary evidence then filed in the action or submitted by the parties . . . ." *Id*. (quotation marks and citation omitted; alteration in original).

Subject-matter jurisdiction refers to the court's right to exercise its judicial power over a class of cases, as opposed to the case before the court. *Southfield v Shefa, LLC*, 340 Mich App 391, 406; 986 NW2d 607 (2022). " 'A trial court is duty-bound to recognize the limits of its subject-matter jurisdiction, and it must dismiss an action when subject-matter jurisdiction is not present.' " *Id*. (citation omitted).[4] "A challenge to a court's subject-matter jurisdiction is determined by allegations in the pleadings." *Id*.

Preemption under *Garmon* is considered somewhat "unusual," as under that decision "the NLRA preempts state law even when the two only *arguably* conflict," *Glacier Northwest, Inc v Int'l Bhd of Teamsters Loc Union No 174*, 598 US 771, 776; 143 S Ct 1404; 216 L Ed 2d 28 (2023), whereas the Court "typically applies a high bar before concluding that federal law 'strip[s] state courts of jurisdiction to hear their own *state* claims,' " *id*. at 785 (THOMAS, J., joined by ALITO, J., concurring), quoting *Atlantic Richfield Co v Christian*, 590 US 1, 15-16; 140 S Ct 1335; 206 L Ed 2d 516 (2020) (alteration in original). Yet *Glacier Northwest* adhered to the *Garmon* doctrine, including its two exceptions.

The extent of *Garmon* preemption was discussed in *Henry*. There, the Court explained, "[i]n the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively or when it actually conflicts with federal law." *Henry*, 495 Mich at 275 (quotation marks and citations omitted). There is no standard formula, and the key is whether Congress intended to preempt state law in relation to the specific context of the state law at issue. *Id*. at 275-276.

As it relates to the NLRA, the Court explained that the law creates "federal rules of decision regarding labor relations, but also delegates enforcement of that policy to an administrative agency," referring to the NLRB. *Id*. at 277. Section 7 of the NLRA provides, in relevant part:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own

---

[4] For this reason, the FCA Defendants' suggestion that GM waived this issue by failing to argue the substantive merits in its brief on appeal is of no consequence. This Court is independently obligated to examine its subject-matter jurisdiction.

choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .  [29 USC 157.]

Section 8 of the NLRA also prohibits employers from interfering with, restraining, or coercing employees from participating in the protected activities outlined in § 7.  29 USC 158(a)(1).  The NLRA charges the NLRB with prevention of unfair labor practices affecting commerce.  29 USC 160(a).[5]  The congressional purpose of the designation of the NLRB as a central administrative agency was to apply substantive rules uniformly and avoid possible differences and conflicts from the application of local laws and procedures on labor controversies.  *Henry*, 495 Mich at 277.

*Garmon* explored "the extent to which the maintenance of a general federal law of labor relations combined with a centralized administrative agency to implement its provisions necessarily supplants the operation of . . . state regulation."  *Id*. at 278 (quotation marks and citation omitted).  As the *Garmon* Court declared, "[w]hen an activity is arguably subject to [§§ 7 or 8] of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted."  *Garmon*, 359 US at 245.  "To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law."  *Id*. at 244.

According to the *Garmon* Court, to show that the claims are "arguably subject" to NLRB jurisdiction, "the party claiming pre-emption is required to demonstrate that his case is one that the Board could legally decide in his favor."  *Int'l Longshoremen's Ass'n, AFL-CIO v Davis*, 476 US 380, 395; 106 S Ct 1904; 90 L Ed 2d 389 (1986).  Thus, the party must "advance an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board."  *Id*.  The focus is on the conduct—not on the formal description of the legal standards in issue.  *Henry*, 495 Mich at 287.

The *Garmon* Court did, however, recognize two exceptions to the general rule regarding preemption.  The first exception, not applicable here, applies "where the activity regulated was a merely peripheral concern" of the NLRA.  *Garmon*, 359 US at 243.  The second exception exists "where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [the Court] could not infer that Congress had deprived the States of the power to act."  *Id*. at 244.  The key concern of the second exception is "whether there exist[s] a significant state interest in protecting the citizen from the challenged conduct and whether the exercise of state jurisdiction over the [state] claim entail[s] little risk of interference with the regulatory jurisdiction of the [NLRB]."  *Henry*, 495 Mich at 280 (quotation marks and citation omitted; alterations in original).  In this context, the NLRA does not preempt state-law claims involving intentional torts such as trespass, intentional infliction of emotional distress (IIED), "malicious interference with a lawful occupation," or malicious libel.  *Id*.

*Henry* involved claims under The Whistleblowers' Protection Act, MCL 15.361 *et seq*., arising from alleged retaliation for reporting suspected wrongdoing to the United States

---

[5] There is no dispute for purposes of these appeals that the issues raised in the second amended complaint would affect commerce.  29 USC 152(7).

Department of Labor. *Id*. at 267, 288. The *Henry* Court held that the plaintiffs were seeking to improve their working conditions and acted with the purpose of furthering the goals of a group, which was considered protected activity under the NLRA. *Id*. at 288-289. "Their claims of unfair wages and an unsafe work environment are prototypical issues of dispute under the NLRA." *Id*. at 289. The claims were therefore arguably protected under the NLRA and subject to NLRB preemption, and neither of the *Garmon* exceptions applied to the plaintiffs' concerted activity. *Id*. at 289-290. See also *Calabrese v Tendercare of Mich, Inc*, 262 Mich App 256, 257, 263-264; 685 NW2d 313 (2004) (holding that the plaintiff's wrongful-discharge and tortious-interference claims arising from the wrongful termination of her employment after she refused to fire other employees for engaging in unionizing activities were preempted under *Garmon* because the plaintiff alleged that the defendants engaged in unfair labor practices). But see *Roberts v Auto Club of Mich*, 138 Mich App 488, 497; 360 NW2d 224 (1984) (holding that *Garmon* preemption did not apply to a contractual dispute because the state has a substantial interest in adjudicating contract claims), and *Trudeau v Fisher Body Div, Gen Motors Corp*, 168 Mich App 14, 19; 423 NW2d 592 (1988) (holding that the plaintiff's intentional tort claim against her employer was not preempted under *Garmon* because the plaintiff did not allege a violation of the NLRA, the tortious activity did not require analyzing the terms of a collective-bargaining agreement, and "the state has a legitimate and substantial interest in protecting its citizens from the tort complained of").[6]

The FCA Defendants argue that GM's claims are arguably subject to the NLRA because they are predicated on an "overarching bribery scheme," and therefore are essentially based on the FCA Defendants breaching a duty to bargain in good faith. More specifically, the FCA Defendants argue that the basic gist of the unfair competition claim is that FCA obtained benefits and advantages from the UAW that were denied to GM. However, that claim contains no allegations under §§ 7 or 8 of the NLRA or that would arguably fit under those statutory provisions. Again, the focus of § 7 is on the rights of employees to be involved in labor organizations, bargain collectively, or engage in concerted activities, 29 USC 157, while the focus of § 8 is on prohibiting an employer from interfering with, restraining, or coercing employees from participating in the protected activities outlined in § 7, 29 USC 158(a)(1). While in a general sense engaging in bribery

---

[6] We disagree with the FCA Defendants' assertion that in *Gen Motors, LLC*, the Sixth Circuit already addressed *Garmon* preemption involving "virtually identical factual allegations." First, the Sixth Circuit did not address explicitly whether *Garmon* preemption applied to GM's state-law claims, which were dismissed by the time the case reached the appellate court. It was assumed, for purposes of the issue, that the NLRB would have jurisdiction but for the language in RICO incorporating § 186 of the LMRA. Second, and perhaps more importantly, the allegations in the federal litigation were focused on the bribery scheme and how the scheme impacted GM. *Gen Motors, LLC*, 44 F4th at 551-556. While the first-amended complaint in the federal case mentioned the scheme to have Ashton and Iacobelli infiltrate GM, the focus in that case was the broader bribery scheme that occurred between 2009 and 2015. In contrast, although the second-amended complaint in this case discusses the bribery scheme as it occurred between 2009 and 2015, the claims themselves are focused primarily on the events occurring in 2015 and later, and specifically on whether Iacobelli and other individuals infiltrated GM and passed along trade secrets and confidential information. So, while the causes of action in the two lawsuits were interrelated, the factual basis was not identical, or even substantially similar.

might interfere with the collective-bargaining rights of GM's employees, the focus of GM's unfair-competition claim is on the damages done to GM as a business, not to its employees as union members. Resolving the claim also does not require interpreting a collective bargaining agreement, and the relief sought does not seek to untie any labor contracts. Nor do the allegations indicate that FCA interfered with, restrained, or coerced its own employees from participating in any protected activities. To reach that conclusion would require reading additional allegations into the second-amended complaint. For this reason, the unfair-competition claim does not arguably fall under either section of the NLRA.

The fraud claim is a closer call, as it is premised on the allegation that FCA and the UAW "orchestrated a decade-long conspiracy to corrupt the collective bargaining process and labor relations and harm GM." Specifically, GM alleged that former FCA president Sergio Marchionne made misrepresentations in relation to the status of the collective-bargaining process in 2015 and that Williams falsely advised GM during the bargaining process about the UAW's relationship with FCA and why the UAW selected FCA as its targeted company for bargaining. The second-amended complaint further details how Ashton's and Iacobelli's fraudulent misrepresentations harmed GM, as the purpose of the false statements surrounding the 2015 collective-bargaining negotiations "was to assure GM, and the public, that their decisions related to the selection of FCA as the lead and the substance of the 2015 tentative agreement was not tainted by any wrongdoing."

But as noted, GM is not seeking damages on behalf of its employees for violation of labor laws, but rather, is seeking damages on its own behalf for various torts it alleges FCA and the individual defendants committed. Thus, while there is a colorable argument that the fraud claim at least touches on protected activity under § 7 of the NLRA, because the focus is on misrepresentations made to harm a competitor, and not the collective-bargaining process itself, we conclude that the fraud claim is not preempted under *Garmon*.[7]

The FCA Defendants present caselaw from various federal circuit courts purportedly holding that for *Garmon* preemption to apply, the employee need not be the plaintiff, and the claim can be filed by various other individuals and entities. *Nat'l Labor Relations Bd v Indiana & Mich Electric Co*, 318 US 9, 17; 63 S Ct 394; 87 L Ed 579 (1943). True enough, but they have cited no caselaw extending *Garmon* preemption to a fraud claim by a competitor for damages *to the competitor*, as opposed to the competitor's employees.[8]

---

[7] The civil-conspiracy claim is premised on the viability of the other claims, *Early Detection Center, PC v New York Life Ins Co*, 157 Mich App 618, 632; 403 NW2d 830 (1986), so it is likewise not preempted by federal law.

[8] To support federal jurisdiction, the FCA Defendants cite two unpublished federal district court decisions, *DeShetler v FCA US, LLC*, unpublished opinion of the United States District Court for the Northern District of Ohio, issued November 30, 2018 (Case Nos. 3:18-CV-78 and 3:18-CV-85), aff'd 790 Fed Appx 664 (CA 6, 2019), and *Swanigan v FCA US, LLC*, unpublished opinion of the United States District Court for the Eastern District of Michigan, issued August 23, 2018 (Case No. 18-cv-10319), aff'd 938 F3d 779 (CA 6, 2019), both of which were LMRA lawsuits arising from the same bribery scheme. However, neither of these cases involved GM or the

Even if the second-amended complaint arguably alleged unfair labor practices falling within the scope of the NLRA, we would conclude that the local-interest exception applied as the issues raised in that complaint touch on interests that are so deeply rooted in local feeling and responsibility that, absent compelling congressional direction, we should not infer that Congress intended to deprive the state of the power to act. See *Henry*, 495 Mich at 280.

As recounted, the second-amended complaint alleges a variety of intentional tort claims which are historically considered matters of local concern that are not preempted under the NLRA. See *Garmon*, 359 US at 247 (Court identified, as typical of the kind of state law that would not be pre-empted, "the traditional law of torts."). And the local feeling and responsibility are perhaps even more compelling in a case involving the interrelations between two of the three Detroit-based automakers, where billions of dollars in damages are at stake, and where the outcome could indirectly affect both Michigan's economy and its citizens. The NLRA does not contain any provisions that could be characterized as "compelling congressional direction" that would dictate that the NLRA applies in this context. Also, the FCA Defendants do not explain, and we cannot discern, how the state's adjudication of the issues in the second-amended complaint would threaten undue interference with the federal regulatory scheme. See *Farmer v United Brotherhood of Carpenters & Joiners of America, Local 25*, 430 US 290, 305; 97 S Ct 1056; 51 L Ed 2d 338 (1977) (framing the issue of local feeling and responsibility as whether the NLRB should retain sole jurisdiction because "there is a realistic threat of interference with the federal regulatory scheme"). Resolution of these claims will not entail a review of the terms of any collective bargaining agreement, see *Trudeau*, 168 Mich App at 19, there is no allegation of unfair labor practices that will be resolved as would occur in the NLRB, see *Roberts*, 138 Mich App at 497, and if GM prevails it will not be awarded relief that interferes with the collective bargaining agreements that were completed years ago, but would be awarded damages that the NLRB could not award. See *Radcliffe v Rainbow Constr Co*, 254 F3d 772, 787 (CA 9, 2001).

Even if there were any legitimate threat to the federal scheme under the NLRA, it is counterbalanced by the state's legitimate and substantial interest in enforcing its own tort law. See *Roberts*, 138 Mich App at 494-497 (discussing both *Linn v United Plant Guard Workers*, 383 US 53; 86 S Ct 657; 15 L Ed 2d 582 (1966) (malicious libel), and *Farmer* (state intentional infliction claim not preempted)); *Belknap, Inc v Hale*, 463 US 491, 509-511; 103 S Ct 3172; 77 L Ed 2d 798 (1983) (holding that a state has an interest in protecting its citizens from fraudulent misrepresentations that involve issues peripheral to the NLRA and that for the state to decide the claims for breach of contract and fraud by replacement workers during a strike the state court did not have to adjudicate any issues that could have been presented to the NLRB). For these reasons, *Garmon* preemption does not apply, and the trial court had subject-matter jurisdiction over this case.

Nor do we agree with the FCA Defendants that the NLRB has already exercised its jurisdiction over the issue of prohibited payments that "underpin" GM's claims. Back in 2021, an NLRB administrative law judge dismissed claims against the UAW relating to the bribery scheme,

---

allegations involving the alleged infiltration by FCA's former employees to pilfer trade secrets and confidential information, and therefore provide no helpful guidance.

which included allegations that representatives of FCA "unlawfully bribed agents of the [UAW] to the tune of over a million dollars from 2010 to 2015." *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America (UAW), AFL-CIO (FCA US, LLC)*, unpublished decision of the National Labor Relations Board, Division of Judges, issued February 26, 2021 (Case Nos. 07-CB-213726, 07-CB-213747, and 07-CB-213749), adopted by *Int'l Union, United Auto, Aerospace & Agricultural Implement Workers of America (UAW), AFL-CIO (FCA US, LLC)*, unpublished order of the National Labor Relations Board, entered May 11, 2021 (Case Nos. 07-CB-213726, 07-CB-213747, and 07-CB-213749). This conduct allegedly occurred "during a time period when FCA and the UAW twice negotiated successor collective-bargaining agreements covering unit employees." *Id*. at 2. The NLRB's general counsel alleged that the UAW breached a duty of fair representation to its employees and violated § 8(b)(1)(A) of the NLRA by engaging in conduct that was "inherently destructive of employees' rights." *Id*. at 2. The ALJ dismissed the claim because the general counsel relied solely on hearsay statements found within the various plea agreements in the criminal cases to support the allegations against the UAW. *Id*. at 3, 26-27.[9] Neither the ALJ nor the Board resolved the issues raised here.

## B. FIFTH AMENDMENT

Turning now to the first non-jurisdictional issue, Iacobelli argues that the trial court abused its discretion in granting defendants' motion to compel his answers to upward of 500 deposition questions. According to Iacobelli, the Fifth Amendment to the United States Constitution permits him to avoid providing answers because answering them could incriminate him.

The right to be protected from self-incrimination is recognized under both the Fifth Amendment, as applied to the states through the Fourteenth Amendment to the United States Constitution, as well as under Michigan's 1963 Constitution. *PCS4LESS, LLC v Stockton*, 291 Mich App 672, 677 & n 3; 806 NW2d 353 (2011). The Fifth Amendment protections are not limited to the criminal context; they protect an individual from answering questions "[i]n any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Id*. at 677 (quotation marks and citation omitted). Or stated differently, the Fifth Amendment extends to any situation in which a forced answer to a question "would furnish a link in the chain of evidence needed to prosecute[.]" *Id*. (quotation marks and citations omitted). See also *Hoffman v United States*, 341 US 479, 486; 71 S Ct 814; 95 L Ed 1118 (1951). And the privilege may be invoked even if a criminal proceeding has not been instituted or planned. *Huntington Nat'l Bank v Ristich*, 292 Mich App 376, 384; 808 NW2d 511 (2011).

But a party or witness cannot simply invoke the amendment's protections for any reason. As explained in *Hoffman*, the seminal case on the scope of the Fifth Amendment privilege, the protection afforded by the privilege "must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Hoffman*, 341 US at 486. Thus, "[t]he witness is not exonerated from answering merely because he declares that in so doing he

---

[9] Contrary to what the FCA Defendants argue, the NLRB action was focused on the conduct of the UAW and did not involve any allegations on the part of GM, specifically. In fact, the ALJ never discussed jurisdiction in the opinion provided to this Court, and no judgment was entered resolving the allegations GM raises here.

-17-

would incriminate himself—his say-so does not of itself establish the hazard of incrimination." *Id*. Rather, the court must decide whether the privilege applies and must require the party to answer the question "if it clearly appears to the court that he is mistaken." *Id*. (quotation marks and citation omitted). The privilege therefore only applies to "real dangers," and not to "remote and speculative possibilities." *Zicarelli v New Jersey State Comm of Investigation*, 406 US 472, 478; 92 S Ct 1670; 32 L Ed 2d 234 (1972). "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman*, 341 US at 486-487. Accord *PCS4LESS*, 291 Mich App at 678, and *In re Morganroth*, 718 F2d 161, 167 (CA 6, 1983) (the privilege should be applied liberally but cannot be applied "if it clearly appears that [the witness] is mistaken as to the justification for the privilege in advancing his claim as a subterfuge").

To that end, in order to compel the answer it must be "perfectly clear to the court 'from a careful consideration of all of the circumstances in the case, that a witness is mistaken, and that the answer[s] cannot possibly have such a tendency to incriminate.' " *Id*. at 169, quoting *Hoffman*, 341 US at 488 (alteration in original). Thus, "sufficient evidence is presented by a witness if a court can, by the use of reasonable inference or judicial imagination, conceive a sound basis for a reasonable fear of prosecution." *Morganroth*, 718 F2d at 169. The Sixth Circuit explained, however, that

> a witness must supply personal statements under oath or provide evidence with respect to each question propounded to him to indicate the nature of the criminal charge which provides the basis for his fear of prosecution and, if necessary to complement non-testimonial evidence, personal statements under oath to meet the standard for establishing reasonable cause to fear prosecution under this charge. [*Id*. at 169-170.]

Additionally, "[i]t is well settled that a defendant may waive his right . . . to claim his Fifth Amendment privilege against self-incrimination by negotiating a voluntary plea agreement with the government." *United States v Scruggs*, 356 F3d 539, 546 (CA 4, 2004) (quotation marks and citation omitted; alteration in original). Whether the statute of limitations has run on a crime is also relevant, as "the Fifth Amendment's privilege against self-incrimination does not apply after the relevant limitations period has expired." *Stogner v California*, 539 US 607, 620; 123 S Ct 2446; 156 L Ed 2d 544 (2003).

## 1. PROPER LEGAL STANDARD

Iacobelli first raises some semantics. He argues that the trial court committed a legal error by adopting the facilitator's report and recommendation despite language in the report stating the legal standard as whether the questioning would "expose the witness to a genuine threat of prosecution," relying on this Court's unpublished opinion in *People v Barbour*, unpublished per curiam opinion of the Court of Appeals, issued July 8, 2010 (Docket No. 290341). Although the facilitator did not commit a legal error by relying on this Court's unpublished opinion, an unpublished opinion is not precedent and should not be cited when a published decision states the same proposition of law. And the *Barbour* Court's position that there must be a reasonable basis for the witness to anticipate incrimination, and that the threat cannot be remote or speculative, was

supported by published caselaw. In any event, like the trial court, we see no discernable difference between the "genuine prosecution" standard and the "real danger" standard outlined in *Hoffman*. In either case, the question is essentially the same: was there a reasonable basis for the witness to fear incrimination, or was the fear of incrimination too remote or speculative?

In that regard, the facilitator also properly cited the legal standard as whether "the witness 'has reasonable cause to apprehend danger' of criminal liability" and whether "the individual 'reasonably believes' " the evidence " 'could be used against him in a criminal prosecution,' " quoting *Hoffman*, 341 US at 486, and *Maness v Meyers*, 419 US 449, 461; 95 S Ct 584; 42 L Ed 2d 574 (1975). The facilitator applied the correct legal standard in reviewing the arguments, and no legal error occurred.[10]

## 2. SELECTIVE WAIVER

Turning to the merits, Iacobelli criticizes the facilitator for only discussing three examples of selective waiver in her report and recommendation (designated as Category 1), rather than discussing each of the nearly 250 instances of alleged selective waiver individually. To the contrary, however, the facilitator conducted a detailed, question-by-question analysis of the invocations of privilege and, as noted, designated the questions into five different categories.

Regarding selective waiver, the Supreme Court has held that "a witness, in a single proceeding, may not testify voluntarily about a subject and then invoke the privilege against self-incrimination when questioned about the details." *Mitchell v United States*, 526 US 314, 321; 119 S Ct 1307; 143 L Ed 2d 424 (1999). When this occurs, the individual waives the privilege for the matters for which he provides testimony, "and the scope of the waiver is determined by the scope of relevant cross-examination." *Id*. (quotation marks and citation omitted). The Court explained that "[t]he justifications for the rule of waiver in the testimonial context are evident: A witness may not pick and choose what aspects of a particular subject to discuss without casting doubt on the trustworthiness of the statements and diminishing the integrity of the factual inquiry." *Id*. at 322. Otherwise, the witness could distort the facts by self-selecting where to stop in the testimony. *Id*. See also *In re Flint Water Cases*, 53 F4th 176, 202 (CA 6, 2022) ("A witness cannot set forth certain testimony and then 'withdraw from the cross-fire of interrogation before the reliability of his testimony has been fully tested.' ") (citation omitted).

The first category of questions relate to allegations in Iacobelli's criminal indictment regarding misappropriation of NTC funds for his personal use, including purchasing a 2013

---

[10] Iacobelli also faults the facilitator for interchangeably using the terms "incrimination" and "prosecution," but the federal courts have used the terms interchangeably as well. See *In re Morganroth*, 718 F2d at 166-169. Iacobelli likewise criticizes GM for referring to the "real danger" of prosecution instead of the "possibility of prosecution" throughout its briefing, citing *Convertino v United States Dep't of Justice*, 795 F3d 587, 594 (CA 6, 2015). This is again a matter of semantics and, as stated earlier, the facilitator correctly articulated the legal standard. See *Hoffman*, 341 US at 484.

Ferrari. During his deposition, Iacobelli testified that he was told by FCA that he was being terminated because of the Ferrari purchase, and later provided details about that transaction, which he claimed was purchased for a raffle at a charity event. He explained that, after the charity idea fell through, he offered to pay for the vehicle and later took possession of it. The trial court found that Iacobelli engaged in selective waiver by refusing to answer questions about the details of the Ferrari purchase as well as "questions concerning other purchases he made or authorized that were paid for with NTC funds," after he had opened the door to questioning about the other personal purchases he made by testifying about purchasing the Ferrari.

Iacobelli's testimony about the Ferrari clearly opened the door to further questions about the Ferrari, though whether he waived the privilege as it relates to any other personal purchases he made through the use of NTC funds is less clear. Nevertheless, because Iacobelli could not pick and choose among which NTC-funded purchases to discuss at his deposition after voluntarily discussing the Ferrari, the court's decision did not fall outside the range of reasonable and principled outcomes. Once Iacobelli opened the door to his personal purchases, he waived the privilege on that subject.

With regard to Iacobelli's refusal to testify about whether he communicated with FCA officials or employees after he was terminated, Iacobelli testified that he never spoke with Marchionne after he left FCA in 2018. Yet he refused to answer several follow-up questions about those conversations with Marchionne. Under the selective waiver doctrine, once Iacobelli opened the door by testifying that he had no conversations with Marchionne after he left FCA, he waived the privilege about his communications with Marchionne.

The final example highlighted by the trial court was Iacobelli's invocation of waiver in relation to DeLorenzo's affidavit. As the court noted, Iacobelli volunteered during his deposition that "there are a number of inaccuracies in his affidavit, gross inaccuracies and misstatements." Yet, he later invoked his Fifth Amendment privilege when asked to identify those inaccuracies. Under established law, once Iacobelli testified that the affidavit contained inaccuracies, he could not withdraw from the crossfire on this issue by invoking privilege, regardless of whether his testimony was "vague" in nature.

Iacobelli also argues that he did not selectively waive his Fifth Amendment privilege when he was simply asked to confirm the language of his plea agreement, which he argues GM's counsel sometimes incorrectly paraphrased. We agree that any instance in which he simply confirmed that GM's counsel read his plea agreement accurately was not a selective waiver of his Fifth Amendment privilege. Iacobelli did not volunteer any information by confirming that GM's counsel had correctly read his plea agreement. However, any error the trial court may have committed in relation to this category of selective waiver was harmless because, as we explain later, Iacobelli did not have a reasonable apprehension of a real danger of incrimination. The trial court's ruling on this issue was not an abuse of discretion.

## C. SPOUSAL PRIVILEGE

Iacobelli also argues that the trial court abused its discretion in not allowing him to assert the spousal privilege in response to almost two dozen questions that he claims could criminally implicate Susanne.

This Court reviews as a mixed question of law and fact whether a privilege exists. *Centennial Healthcare Mgt Corp v Mich Dep't of Consumer & Indus Servs*, 254 Mich App 275, 284; 657 NW2d 746 (2002).[11] We review de novo whether the trial court properly applied the law to the facts and review for clear error the trial court's factual findings in relation to the privilege. *Id*. Clear error occurs when this Court is definitely and firmly convinced that the trial court made a mistake. *Hill v City of Warren*, 276 Mich App 299, 308; 740 NW2d 706 (2007).

"The common law governs a claim of privilege, unless a statute or court rule provides otherwise." MRE 501. Michigan's spousal privilege is contained in MCL 600.2162, and codified the common-law spousal privilege. *People v Stubli*, 163 Mich App 376, 379; 413 NW2d 804 (1987). It provides, in relevant part:

> In a civil action or administrative proceeding, a husband shall not be examined as a witness for or against his wife without her consent or a wife for or against her husband without his consent, except as provided in subsection (3). [MCL 600.2162(1).]

The statute outlines certain exceptions to privilege in subsection (3), but none are at issue in this appeal. See MCL 600.2162(3). As with any privilege, the spousal privilege should be construed narrowly and the exceptions should be applied broadly. *People v Fisher*, 442 Mich 560, 574-575; 503 NW2d 50 (1993). The historical justification for spousal privilege was to preserve marital harmony. *People v Wadkins*, 101 Mich App 272, 283; 300 NW2d 542 (1980).

The key questions we must resolve are whether (1) the spousal privilege in MCL 600.2162(1) applies to testimony about a spouse who is not a party to the proceeding (or any related proceeding), and (2) the privilege applies to a spouse who is not at risk of prosecution because the limitations period has expired for any potential charges. Iacobelli's theory is that the spousal privilege protected his testimony because, in his view, GM is attempting to implicate Susanne in a broader conspiracy involving "imaginary foreign accounts."[12]

---

[11] *Krusac v Covenant Med Ctr, Inc*, 497 Mich 251, 263 n 10; 865 NW2d 908 (2015), limited the holding and reasoning in *Centennial* relating to peer-review privilege to its facts, but did not otherwise vacate or modify that decision.

[12] Relying on *Fisher*, GM and the FCA defendants argue that the privilege does not apply because Iacobelli's testimony was not taken in court, arguing that under a narrow interpretation of the statute, spousal privilege would not apply to out-of-court deposition testimony. In *Fisher*, 442 Mich at 563, 576, the Court held, in the context of a criminal appeal, that the marital-communications privilege, MCL 600.2162(4), did not apply to statements the defendant's estranged wife made to a police detective that were later set forth in a search-warrant affidavit and outlined in the presentence investigation report, because the spouse was never examined as a witness. The Court held that the phrase " 'be examined' " relates only to "a spouse's privilege against being questioned as a sworn witness about the described communications." *Id*. at 575. Thus, the privilege was limited to situations in which the spouse is examined "in court proceedings." *Id*. at 576. As the Court explained, "[b]ecause defendant's spouse was not

-21-

The spousal privilege did not apply to Iacobelli's testimony because the statute applies only to testimony by one spouse "for or against" the nontestifying spouse within the same civil action or administrative proceeding. MCL 600.2162(1). To that point, the parties do not dispute that Susanne could not be called at trial to testify against Iacobelli, absent some applicable exception to spousal privilege. Likewise, should Susanne ever be sued or should criminal charges be filed against her in Michigan, she could invoke the spousal privilege in relation to the admission of any incriminating testimony by Iacobelli. But Susanne is not a party to this civil action (or any of the related actions), which is dispositive because of the longstanding principle of common law that "neither husband nor wife could be examined as witnesses for or against each other when either was an actual party to the litigation, whether civil or criminal." *Parsons v People*, 21 Mich 509, 512 (1870). No matter, Iacobelli argues, because Susanne may be implicated by his testimony regarding her involvement with foreign financial accounts on the basis of GM's assertion that Susanne maintained foreign financial accounts in her name and facilitated the foreign accounts in her husband's name.

To the contrary, in *People v Upton*, 169 Mich 31, 35; 135 NW 108 (1912), the Court concluded that, under a prior version of the spousal-privilege statute which also contained the "for or against" language, the victim's wife could testify at trial in an assault case because "[h]er husband was not a party to the proceeding, and, in a legal sense, her testimony concerning what occurred would be neither for nor against him." This was true even though the prosecutor argued that any testimony the wife may give would tend to prove that the victim was the aggressor and would therefore implicate him in the crime. *Id*. Likewise, the current version of the spousal privilege statute contains no language that would allow the privilege to apply to testimony that may impact Susanne's interests or that could be construed as broad enough to cover her reputation, well-being, or marital relationship. See MCL 600.2162(1).

Several decisions highlight our conclusion. In a case relied upon below, *United States v Burks*, 152 US App DC 284, 287-288; 470 F2d 432 (1972), quoting 8 Wigmore, Evidence (McNaughton rev), § 2234, p 231, the United States Court of Appeals for the District of Columbia Circuit[13] held that the common-law spousal privilege was limited because it "applies only when the testimony of one spouse would favor or disfavor 'the other spouse's *legal interests in the very case* in which the testimony is offered.' " Additionally, as the court explained, the Wigmore treatise expressly stated that the privilege did not extend to situations in which the testimony would simply disparage or disfavor the other spouse. *Burks*, 152 US App DC at 435 n 6.

Also contrary to Iacobelli's position is *United States v George*, 444 F2d 310, 313 (CA 6, 1971), where the court rejected the defendant's argument that his grand-jury testimony would force

---

examined as a witness, we conclude that the privilege was not available in the circumstances presented here." *Id*. at 563. However, depositions contain sworn testimony and are part of court proceedings, unlike out-of-court statements a witness gives to police.

[13] The federal privilege also codified the common law and includes the same "for or against" language contained in the Michigan statute, so caselaw construing that same language can be persuasive. See *Haydaw v Farm Bureau Ins Co*, 332 Mich App 719, 726 n 5; 957 NW2d 858 (2020), and *United States v George*, 444 F2d 310, 313 (CA 6, 1971).

-22-

him to be a witness against his wife on the basis that they "filed joint income tax returns, and that his testimony might possibly indicate discrepancies between their reported and actual income, thereby conceivably exposing his wife to civil and criminal penalties." The court held the privilege inapplicable, reasoning that the questions did not relate in any way to the defendant's wife, who was not being investigated by the grand jury. *Id*. at 314. Extending spousal privilege to hypothetical claims against the spouse would frustrate the grand-jury process and the court noted there was no evidence the government intended to use the defendant as a witness against his wife. *Id*. See also *United States v Premises Known As 281 Syosset Woodbury Rd*, 71 F3d 1067, 1070-1071 (CA 2, 1995) (The court explained in dicta that even if spousal privilege applied in the context of civil forfeitures, "[t]he adverse spousal testimony privilege is not applicable except in proceedings where one spouse is a party and the other spouse is called to testify.").[14]

In any event, even if spousal privilege could be construed to apply to testimony by one spouse that could potentially harm the nontestifying spouse in a future legal proceeding, there is no risk that Iacobelli's responses to the 20 deposition questions would be against Susanne's legal interests. See *In re Grand Jury*, 111 F3d 1083, 1087 (CA 3, 1997) (explaining that spousal privilege is not available if the testimony would not be adverse to the nontestifying spouse).

Iacobelli argues that GM made "broad allegations of illegal conduct" involving foreign bank accounts against Susanne in the related federal actions (such as the *Ashton* cases), and his deposition testimony could incriminate Susanne. Again, the questions for which Iacobelli invoked spousal privilege involved the alleged embezzlement of NTC funds back in the 2009 to 2015 timeframe, primarily asking about an American Express account. None of the questions involved alleged foreign bank accounts. The theft of the NTC funds occurred before Iacobelli left FCA in mid-2015. So any criminal charges arising from that embezzlement would be time-barred under the five-year limitations period outlined in 18 USC 3282(a).

---

[14] Iacobelli's reliance on *In re Grand Jury Matter*, 673 F2d 688, 692-693 (CA 3, 1982), in which the court addressed a situation where the government was openly seeking one spouse's testimony to implicate the nonwitness spouse in a crime, is misplaced. The court held that, in that limited circumstance, "the testimony sought is sufficiently adverse to the interests of the absent spouse to permit invocation of the privilege against adverse spousal testimony." *Id*. at 692. Accord *In re Grand Jury Subpoena to Mrs CD*, 22 F Supp 2d 507, 507-509 (D Md, 1998) (following *Grand Jury Matter* in a case in which the wife was subpoenaed to answer questions before a grand jury concerning her activities and transactions when her husband was one of the targets of the grand jury's investigation of an alleged conspiracy). Here, no evidence suggests that Susanne is being targeted for prosecution by any entity. And this is a dispositive difference as the court noted in *Woodbury Rd*, 71 F3d at 1071 (*Grand Jury Matter* was limited "to situations in which the government is manifestly seeking to use a spouse's testimony in one proceeding against her or his partner in a related proceeding."). Indeed, none of the 20 questions were about foreign bank accounts—the questions were about the personal charges that Iacobelli made through NTC funds, primarily through the use of an American Express account. Iacobelli's theory that GM was seeking to use his testimony as a basis for a future claim against Susanne is speculative.

Similarly, any tax-fraud charges against Susanne relating to the theft of NTC funds would be barred by the six-year limitations period. 26 UC 6531(1). The same six-year limitations period applies in Michigan for civil fraud and conspiracy. See *Boyle v Gen Motors Corp*, 468 Mich 226, 230; 661 NW2d 557 (2003) (outlining the limitations period for fraud claims); *Terlecki v Stewart*, 278 Mich App 644, 653; 754 NW2d 899 (2008) (explaining that a conspiracy claim has the same limitations period as the underlying wrongful act). The six-year limitations period also applies to state-level criminal charges arising from the theft of NTC funds. MCL 767.24(10). Thus, the limitations period for any potential claim against Susanne arising from her alleged involvement in the conspiracy expired several years ago.

Iacobelli also suggests that Susanne could be prosecuted for subscribing one or more false tax returns after 2015 but fails to provide any concrete details to support this position. As discussed earlier, the allegations regarding the foreign bank accounts related to Iacobelli's conduct from mid-2015 and earlier. There is no reason to believe that Susanne could be charged for subscribing false tax returns after 2015. Similarly, Iacobelli suggests that Susanne could be incriminated for perjury should GM prove that her September 2020 declaration regarding foreign bank accounts was false. But that declaration related to foreign bank accounts, which was again not a subject of the 20 deposition questions at issue in this appeal. Iacobelli's argument that Susanne could be implicated by his testimony is speculative in nature.

As a result, the spousal privilege did not apply because Susanne was not a party to this case and the testimony would not be "against" her. The trial court therefore did not abuse its discretion by compelling Iacobelli's answers to the 20 deposition questions.

## D. SPOUSAL PRIVILEGE - SUSANNE

Finally, as to the production of Susanne's notes, the trial court did not abuse its discretion by finding that the notes were not protected by spousal privilege and by compelling their disclosure.

As noted earlier, MCR 2.302(B)(1) outlines the proper scope of discovery of information in a civil case and provides as follows:

> Parties may obtain discovery regarding any *non-privileged matter* that is relevant to any party's claims or defenses and proportional to the needs of the case, taking into account all pertinent factors, including whether the burden or expense of the proposed discovery outweighs its likely benefit, the complexity of the case, the importance of the issues at stake in the action, the amount in controversy, and the parties' resources and access to relevant information. Information within the scope of discovery need not be admissible in evidence to be discoverable. [Emphasis added.]

At issue are 12 to 15 documents containing handwritten notes that Susanne took regarding discussions with Iacobelli, which were included on her privilege log in the *Ashton* litigation. The documents were not provided in either the trial court or in this Court, but there is no dispute for purposes of this appeal that they include Susanne's handwritten notes and relate to conversations

she had with Iacobelli. Susanne argues that the requested documents are privileged under the Fifth Amendment[15] or, alternatively, on the basis of the spousal privilege.

Turning to the spousal privilege, GM does not dispute for purposes of this appeal that the handwritten notes were intended to be either "for or against" Iacobelli. See MCL 600.2162(1). Rather, the focus is on whether Susanne's production of the documents constitutes an "examination" under the spousal privilege statute. We conclude that it does not, and as a result the spousal privilege statute does not apply to Susanne's production of the notes.

As noted earlier, the *Fisher* Court held that the marital-communications privilege did not apply to statements the defendant's estranged wife made out of court to a police detective that were set forth in a search-warrant affidavit and were later outlined in the defendant's presentence investigation report because the defendant's estranged spouse was never examined as a witness. *Fisher*, 442 Mich at 563, 576. The Court held that the phrase " 'be examined' " relates only to "a spouse's privilege against being questioned as a sworn witness about the described communications." *Id*. at 575. Thus, "the spouse must testify for the privilege to apply," and "[t]he introduction of the marital communication through other means is not precluded." *Id*. Because the estranged spouse was not called to testify at either the trial or at an evidentiary hearing, she was not examined as a witness against the defendant. *Id*. at 575-576.

Susanne argues that GM's reliance on *Fisher* is misplaced because the statements in question in that case were voluntarily provided to the police by the defendant's estranged wife. However, Susanne cites no caselaw that has distinguished *Fisher* on this basis, and there is no language in MCL 600.2162(1) suggesting that application of spousal privilege depends on whether disclosure was voluntary or involuntary in nature. Additionally, although *Fisher* involved a criminal case and the marital-communications privilege, the same rationale can apply to the spousal privilege in the civil context because the critical phrase "be examined" appears in both the spousal-privilege provision and the marital-communication privilege provision. See MCL 600.2162(1) and (4).

The final question is whether the Fifth Amendment act-of-production doctrine may be applied to the notes in question to deem their production testimonial in nature. The act-of-production doctrine originates from *Fisher v United States*, 425 US 391, 408; 96 S Ct 1569; 48 L Ed 2d 39 (1976), in which the Court held, in the context of working papers used to prepare tax returns, that the Fifth Amendment proscribes the compelled production of documentary evidence when an accused individual must make a testimonial communication that is incriminating in nature. The idea is that by producing documents in response to a subpoena, the witness may be making a compelled testimonial act. *United States v Hubbell*, 530 US 27, 36; 120 S Ct 2037; 147 L Ed 2d 24 (2000). "By producing documents in compliance with a subpoena, the witness would

---

[15] Susanne did not argue in the trial court that the Fifth Amendment protected these documents from disclosure, instead relying solely on spousal privilege. Although the Fifth Amendment argument is waived, we will consider it because it involves a legal question that revolves around undisputed facts, and is necessary to fully resolve this issue. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC,* 347 Mich App 280, 289; 14 NW3d 472 (2023).

admit that the papers existed, were in his possession or control, and were authentic." *Id*. (quotation marks and citation omitted).  Also,

> when the custodian of documents responds to a subpoena, he may be compelled to take the witness stand and answer questions designed to determine whether he has produced everything demanded by the subpoena.  The answers to those questions, as well as the act of production itself, may certainly communicate information about the existence, custody, and authenticity of the documents.  [*Id*. at 37.]

Under the "act of production" doctrine the act of producing information — not just the information itself — may be protected by the privilege against self-incrimination.  The doctrine is intended to avoid those situations in which the document production " 'would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime.' "  *Id*. at 38, quoting *Hoffman*, 341 US at 486.

Susanne cites no precedent for her position that the federal act-of-production doctrine applies outside of the Fifth Amendment context or, more specifically, to the spousal privilege in Michigan.  It is also noteworthy that there is no question about the existence or authenticity of the handwritten notes as these facts were established when Susanne produced her privilege log in the *Ashton* litigation, in which she represented that the documents existed and were in her control.

According to Susanne, her Fifth Amendment rights are implicated because GM argued in its motion to compel that the purpose of the document request was "to establish [Susanne's] 'involvement in the UAW bribery scheme.' "  However, beyond this general and short description, Susanne provides no tangible basis for concluding that her disclosure of the notes in the context of this civil litigation would create a real risk of future prosecution.  Indeed, the facilitator correctly found that there was no reasonable risk of prosecution against Susanne because the limitations period expired for both federal and state claims, and the five-year limitations period has also expired for any theoretical perjury charges arising from Iacobelli's and Susanne's September 2020 declarations.  Therefore, Susanne is not protected by the Fifth Amendment privilege from producing the documents.

The trial court did not abuse its discretion by granting GM's motion to compel and finding that the notes in question were not subject to the spousal privilege.

Affirmed.

/s/ Christopher M. Murray
/s/ Michael F. Gadola
/s/ Michael J. Kelly